717 N.E.2d 204 (1999)
In the Matter of the Termination of the Parent-Child Relationship of L.S., D.S., and A.S., Minor Children.
Judy S. and their father, Daniel S. a/k/a Danielle S., Appellant-Respondent,
v.
Noble County Office of Family and Children, Appellee-Petitioner.
No. 57A03-9812-JV-504.
Court of Appeals of Indiana.
September 30, 1999.
Rehearing Denied November 22, 1999.
*206 Howard F. Hanson, Emerick & Diggins, P.C., Kendallville, Indiana, Attorney for Appellant.
Dennis D. Graft, Kendallville, Indiana, Attorney for Appellee.

*205 OPINION
KIRSCH, Judge.
Daniel S., a/k/a Danielle S.,[1] biological father, appeals from an order terminating her parent-child relationship with three of her minor children, L.S., D.S., and A.S. The issue on appeal is whether the State failed to present clear and convincing evidence of the reasonable probability that the conditions that led to the children's removal would not be remedied.
We affirm.

FACTS AND PROCEDURAL HISTORY
Danielle S. is the biological father of L.S., born on September 19, 1985, D.S., born on November 10, 1987, and A.S., born on July 2, 1992. The family has had a long history with the Noble County Office of Family and Children (OFC). The children were originally removed from the home of Daniel and his wife, Judy[2] on February 21, 1994, because Judy had attempted suicide, and there was a protective order against Daniel with respect to Judy and the children. Upon a petition filed by the OFC, the children were adjudicated children in need of services (CHINS) on April 11, 1994. At the initial hearing on the CHINS petition, the parents admitted that the children were children in need of services. The children were ordered to remain in foster care, and the parents were ordered to participate in various services.
On May 20, 1994, a dispositional order was entered, and the children were allowed to return to the family home subject to certain conditions. The children were *207 to remain wards of the OFC. The parents were to participate in marital counseling, the entire family was to participate in family counseling, and Stop Child Abuse Now (SCAN) was to continue to work with the family. However, two months later the court again removed the children from the home of their parents and placed them in foster care. The trial court cited the following reasons for removal:
"1. On the 4th day of July, 1994 the father of the children, [Daniel S.,] Sr. did act in an unreasonable, dangerous, irresponsible manner in regard to the children thus placing them in danger. Specifically, he did operate an automobile in the presence of the children while in a state of rage sufficient to overcome his rational faculties, and while in this state ran over the foot of the mother of the children, [Judy S.] The Court finds that it was only by happenstance and good fortune that only [Judy] was injured during this incident, and it could very well have been that one or more of the children would have been injured or killed.[3]
2. [Daniel and Judy] continue to have significant and severe marital discord. This is frequently manifested in the presence of the children, thereby endangering the emotional well-being of the children.
3. [Judy] has exhibited limited emotional control relative to the children and has inflicted unnecessary and improper corporal punishment upon them.
4. The Psychological counseling upon which the Court had depended to ameliorate and moderate the behavior of [the couple] relative to one another and their children has been totally ineffective because of an apparant [sic] personality conflict between [the couple] and their counselor, Orv Miller, thus eliminating this "safety valve" from the family picture."
Petitioner's Exhibit No. 1.
After the children were removed, the marital problems continued with Daniel being arrested and incarcerated for spousal battery in August 1994.[4] A psychological evaluation of Daniel revealed that he was very self-centered and a high risk for being physically abusive to his wife and children. Throughout the fall of 1994, the couple lived together and separated several times because of their tumultuous relationship. In November 1994, a CASA worker refused to supervise the parents' visits with the children because of Daniel's threatening demeanor and angry outbursts.
From December 1994 through May 1995, Daniel resided at a half-way house and received counseling for depression, gender identity disorder, alcohol abuse, and parenting skills. Daniel's counselor believed that he was not ready to have custody of the children because he needed to work on increased stability, creating a more amicable relationship with Judy, maintaining sobriety, and obtaining his own residence. Upon Daniel's discharge from the half-way house, the couple reunited and again created a hostile environment for their children during supervised visits. In July 1995, Daniel was again arrested for spousal battery. The couple was evicted from their apartment because of their fighting. Neither Daniel nor Judy were in counseling or employed.
On July 12, 1995, Ken Shields, the children's counselor, requested that visitation be suspended for thirty days because the visitations caused the children emotional distress. The parents continued to fight, which made the visits chaotic. Visitation was ordered suspended by the court for this period and then suspended for another ninety days in order for the parents to *208 comply with court-ordered treatment. In late 1995, Shields recommended that neither parent have visitation until they regularly communicated with the children in writing, and that during any visitation Daniel dress as a male. By this time, Daniel was dressing as a woman, and Shields believed that the children were experiencing enough anxiety without the additional stress of seeing their father dressed as a woman. Refusing to dress as a male, Daniel did not visit with the children.
Daniel moved from Indiana to Wisconsin in October 1995 in order to begin the process of gender reassignment. In January 1996, Daniel legally changed his name from Daniel S. to Danielle S. By April 1997, Danielle had completed the necessary surgeries to become a female. Danielle continued to reside out of state until two weeks prior to the termination hearing.
After a two-day termination hearing in August 1998, the trial court concluded that the parental rights of both parents should be terminated. Only Danielle appeals.

DISCUSSION AND DECISION
In reviewing termination proceedings on appeal, this court will not reweigh the evidence nor assess the credibility of witnesses. Egly v. Blackford County Dep't of Public Welfare, 592 N.E.2d 1232, 1235 (Ind.1992). We consider only the evidence that supports the trial court's decision and the reasonable inferences drawn from that evidence. Id. In deference to the trial court's unique position to assess the evidence, we set aside the judgment terminating a parent-child relationship only if it is clearly erroneous. Id. If the evidence and inferences support the trial court's decision, we must affirm. Id.; see also In re D.V.H., 604 N.E.2d 634, 637 (Ind.Ct.App.1992), trans. denied.
The involuntary termination of parental rights is the most extreme sanction a court can impose. Matter of D.G., 702 N.E.2d 777, 780 (Ind.Ct.App.1998). Termination severs all rights of a parent to his or her children. Id. at 781. Therefore, termination is intended as a last resort, available only when all other reasonable efforts have failed. Id. This policy is in recognition of the constitutional rights of the parents to the custody of their children and the State's authority to interfere with this right only in certain limited circumstances. Id. The Fourteenth Amendment to the United States Constitution protects a parent's right to establish a home and raise his children, but these protected interests are not absolute and must be subordinated to the children's interest in determining the appropriate disposition of a petition to terminate the parent-child relationship. Id.
The purpose of terminating parental rights is not to punish the parents, but to protect their children. J.L.L. v. Madison County Dep't of Pub. Welfare, 628 N.E.2d 1223, 1226 (Ind.Ct.App.1994). Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities. Id.
To effect the involuntary termination of a parent-child relationship, the State must present clear and convincing evidence to establish the elements of IC XX-XX-X-X(b)(2). Matter of D.G., 702 N.E.2d at 780. The State must prove:
"(A) the child has been removed from the parent for at least six (6) months under a dispositional decree;
(B) there is a reasonable probability that:
(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or
(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

*209 (C) termination is in the best interests of the child; and
(D) there is a satisfactory plan for the care and treatment of the child."
IC XX-XX-X-X(b)(2).
With respect to the element stated in subsection (B), the trial court concluded:
"Based upon the FINDINGS OF FACT, the Court concludes that there is a reasonable probability that the conditions that resulted in the children's removal and the reasons for their placement outside of the home of their parents, will not be remedied; the CLEAR AND CONVINCING EVIDENCE has also established that a continuation of the parent-child relationship poses a threat to the well-being of the three children because they would not receive adequate care and may even be exposed to abuse if they were returned to the home of either parent. The Court further concludes that there is no evidence that either parent will provide a stable home and environment for the three children in the future."
Record at 101-02. Danielle challenges the trial court's conclusion, arguing that the OFC failed to present sufficient evidence of the reasonable probability that the conditions that led to the children's removal would not be remedied. The trial court found, however, that clear and convincing evidence also established that the continuation of the parent-child relationship posed a threat to the well-being of the children. The statute is written in the disjunctive; it requires the trial court to find only one of the two requirements of subsection (B) by clear and convincing evidence. See In re the Termination of Parental Rights of V.A., 632 N.E.2d 752, 756 (Ind.Ct.App. 1994). Standing alone, the finding that the parent-child relationship posed a threat to the well-being of the children satisfies the requirement listed in subsection (B).
However, there was also sufficient evidence to support the conclusion that a reasonable probability existed that the conditions resulting in the removal of the children were unlikely to be remedied. To determine whether there is a reasonable probability that the conditions which resulted in the removal of the children will not be remedied, the trial court should judge a parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions. J.K.C. v. Fountain County Dep't of Pub. Welfare, 470 N.E.2d 88, 92 (Ind.Ct.App.1984). Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. Id.
While we recognize that the parents no longer live together, and had not lived together for some time prior to the termination hearing, the trial court was obligated to look at the parent's habitual pattern of conduct to determine the likelihood of future neglect or deprivation to the children. Villem DeVillers, a SCAN worker, opined that the couple was "at war" with each other. Petitioner's Exhibit No. 1. Orv Miller, the marital counselor, concurred in this opinion. Id. The marital discord stemmed largely from Daniel's transsexualism and desire for a sex change operation. The Record establishes that upon Daniel's release from the half-way house in May 1995 the couple lived together in Albion, Indiana. Two months later, Daniel was again arrested for spousal battery. Record at 491, 542. Daniel and Judy were later evicted from their apartment with neither being employed or in counseling. In October 1995, Daniel had moved to Wisconsin as the first step in his gender change. A fourth child, N.S., was born in January 1996. On September 9, 1996, Danielle returned to Indiana to pick up N.S. and return to Minnesota where she was then living. Judy followed Danielle a few days later. They lived together until problems again arose between the couple. The Record reveals that the couple had a difficult time separating and *210 living independently of each other because of dependency issues. Furthermore, at the time of the hearing, the couple had taken steps to divorce, but were still married.
The Record also contains evidence of more pervasive, intractable problems than Danielle describes in her argument. The Record is replete with evidence that both parents had serious emotional problems and poor parenting skills. Deanna Gorman, a CASA supervisor, opined that the conditions resulting in removal were the result of basic issues of immaturity, dysfunctional personalities, and an inability to relate in relationships. Record at 302. Gorman did not believe that these basic issues had been remedied and further stated, "I don't know if they could be remedied even with extensive counseling, and that has not occurred." Id. The evidence indicates that Daniel remained emotionally unstable after the children were removed from the home. His psychological evaluation revealed that he was very self-centered and a high risk for being physically abusive to his wife and children. Moreover, he was arrested for spousal battery on several occasions.
The children have been in foster care for nearly five years. With respect to Danielle's relationship with the children, she maintained minimum contact with them. In fact, Garnet Stephens, the OFC caseworker, testified that in October 1996 Danielle requested that she send the necessary paperwork to voluntarily terminate Danielle's parental rights. Record at 300. At the time of the termination hearing, Danielle, by her own choice, had not seen the children for several years. The trial court prohibited visitation unless Danielle would dress as a man. Danielle chose not to conform to this recommendation, refusing to even dress in a neutral manner, such as by wearing blue jeans and a sweatshirt. The Record reveals that the children have had difficulties in understanding their father's apparent abandonment.
The evidence establishes that Danielle was unwilling to cooperate with the OFC in its efforts to reunite the family. Danielle failed to stay in contact with the OFC by providing an address. Thus, no home study could be conducted, and no reunification plans had been made. On one occasion, she attempted to communicate with the children by sending cards to each child. The cards were not given to the children because the cards to the two older children were signed "Danielle," and thus deemed inappropriate. Only the two older children had been told of the sex change. All three children are receiving counseling. Yet, the effect of the gender change on the children seems to have been largely disregarded by Danielle. Danielle was given the opportunity for her gender identity counselor to communicate with the children's counselor about the gender change, her progress, and the impact on and adjustment by the children. Yet, she did not follow through with this request. A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change. Matter of D.B., 561 N.E.2d 844, 848 (Ind. Ct.App.1990).
Danielle highlights the strides she has made in recovery from alcoholism and in counseling for the gender identity disorder. We are not unsympathetic to the severe emotional problems that Danielle has faced, and her efforts to overcome them. Nor are we insensitive to the stigma attached to mental illness and transsexualism. However, we are also not unmindful that the best interests of the child are paramount in termination proceedings and that children should not be compelled to suffer emotional injury, psychological adjustments, and instability to preserve parental rights. Moreover, when the evidence shows that the child's emotional and physical development is threatened, termination of the parent-child relationship is *211 appropriate. Egly, 592 N.E.2d at 1234 (Ind.1992). Again, it was Danielle's choice to place her needs above those of the children by choosing to leave the State. There is no indication that Danielle fully considered the emotional impact that the move out of state had on the children or the psychological adjustment they would face after learning of the gender reassignment.
We are ever mindful of the fact that the court must subordinate the interests of the parents to those of the children when evaluating the circumstances surrounding the termination of the parent-child relationship. Matter of D.G., 702 N.E.2d at 781 (citing Stone v. Daviess County Div. of Children & Family Servs., 656 N.E.2d 824, 828 (Ind.Ct.App.1995), trans. denied). Recognizing that the trial court listened to the testimony of all the witnesses at the two day hearing, observed their demeanor, and judged their credibility, as a reviewing court, we must give proper deference to the trial court. Accordingly, we hold that the trial court was justified in concluding that the OFC proved by clear and convincing evidence that Danielle's parental rights should be terminated.[5]
Affirmed.
DARDEN, J., and BROOK, J., concur.
NOTES
[1] Daniel was born with the outward appearance of a male. However, after he reached puberty doctors discovered that he also had internal female sex organs. Surgery was performed to remove portions of his large and small intestines. Doctors also performed a hysterectomy, and Daniel continued to live as a male. In January 1996, Daniel changed his name to Danielle. In April 1996, Danielle completed the first of two gender reassignment surgeries to become female. The final surgery was completed in April 1997. Consequently, to avoid confusion we will use the pronouns "he" and "his" to refer to Daniel prior to January 1996, and "she" and "her" to refer to Danielle after January 1996.
[2] Judy is the mother of the children and is not a party to this appeal.
[3] Daniel subsequently was convicted of the charges of operating while intoxicated and criminal recklessness, as a Class D felony, for this incident.
[4] The charge was subsequently dismissed.
[5] We have considered Danielle's remaining argument that the trial court made several erroneous findings of fact. Because we conclude that these contentions either have no merit or simply invite us to reweigh the evidence, we hold that the trial court's findings and conclusions are supported by clear and convincing evidence, and thus are not clearly erroneous.