**In the Matter of the Termination of the Parent–Child Relationship of J.W., Minor Child,**

**and**

**Tonya R. (Hall) Weldishofer, Appellant–Respondent,**

**v.**

**Dearborn County Division of Family and Children, Appellee– Petitioner.**

No. 15A05–0206–JV–272.

Court of Appeals of Indiana.

Dec. 13, 2002.

Leanna Weissmann, Lawrenceburg, IN, Attorney for Appellant.

Barbara A. Wyly, Lawrenceburg, IN, Attorney for Appellee.

## OPINION

SHARPNACK, Judge

Tonya R. Weldishofer ("Mother") appeals the trial court's termination of her parental rights to her son, J.W. Mother raises one issue, which we restate as whether the evidence is sufficient to support the termination of her parental rights to J.W. We affirm.

The facts most favorable to the trial court's judgment follow. J.W. was born on March 13, 1999. During the first seven months of his life, J.W. was admitted to the hospital and seen by his pediatrician numerous times. In October of 1999, seven-month old J.W. was admitted to Children's Hospital in Cincinnati, Ohio, after Mother was unable to wake him for several hours. A drug screen revealed the presence of aspirin, butalbital, and opiates, the active ingredients in the prescription drug Fiorinal, in his system. The hospital contacted the Dearborn County Office of Family and Children ("DCOFC"). After an investigation, the DCOFC learned that the drug was placed in J.W.'s baby food. The DCOFC also learned that J.W. ingested the contaminated baby food on a day when Mother was caring for him.

The DCOFC placed J.W. in foster care and filed a petition alleging that J.W. was a child in need of services ("CHINS"). On June 19, 2000, the trial court held that J.W. was a CHINS. Additionally, the trial court noted that reunification efforts were proceeding with J.W. and his father, Joseph Weldishofer ("Father"), and if those reunification efforts continued to go well, J.W. should be reunited with Father. However, the trial court ordered that Mother undergo psychiatric evaluations and have only supervised visitation with J.W. at the discretion of the DCOFC. At the supervised visits, Mother displayed "poor parenting skills." Transcript at 8. Mother would "treat the child as an object instead of an infant dressing him numerous times, displaying him to others ... attention seeking type behaviors, primping in a two-way mirror we had for visitation ...." *Id.*

Mother and Father separated and later divorced. The terms of the divorce decree allowed only supervised visitation between Mother and J.W. J.W. was reunited with Father in June of 2000. Since being reunited with Father, J.W. has not had instances of severe illness.

On January 22, 2001, Mother was evaluated by Dr. Susanne Blix, who specializes in child and adolescent psychiatry and general psychiatry at Indiana University Medical Center and Riley Hospital for Children. Dr. Blix diagnosed Mother with probable factitious disorder by proxy, also known as Munchausen's syndrome by proxy. A person with Munchausen's syndrome by proxy will: (1) describe symptoms or signs of an illness not present; (2) contaminate lab specimens to present a child as ill; or (3) actually make a child physically ill.

Dr. Blix identified several of Mother's characteristics that were consistent with a diagnosis of Munchausen's syndrome by proxy, including: (1) her "extreme immeshment" and "extreme involvement" with J.W.; (2) her "great concern about illnesses"; (3) repeatedly describing J.W. as "sickly" and as a "preemie"; (4) her enjoyment from "being in the caretaker role of someone who is ill"; (5) her medical experience and interest in becoming a neonatology nurse; (6) her satisfaction and fulfillment from the attention she received as a result of J.W.'s illnesses; (7) her failure to mention J.W. by name; and (8) her feelings of intense responsibility to J.W. to the exclusion of her other child. Appellee's Appendix at 44–47. Dr. Blix noted that although some people respond to therapy, Munchausen's syndrome by proxy is not typically treatable. Dr. Blix also diagnosed Mother with an antisocial personality disorder and a histrionic personality disorder. She recommended that Mother be supervised if she were allowed contact with J.W. Further, she recommended that Mother never have custody of J.W.

Shortly after Dr. Blix completed the evaluation, Mother left Indiana without informing the DCOFC or her family where she was going. On April 30, 2001, the DCOFC filed a petition to involuntarily terminate Mother's parental rights to J.W. and requested that the trial court grant sole custody of J.W. to Father. Mother did not return to Indiana or request a visit with J.W. until June of 2001.

After the drugging incident, the State charged Mother with neglect of a dependent as a class D felony.[1] On December

---

1. Ind.Code § 35–46–1–4 (2001). Details of the allegations against Mother that resulted in the neglect of a dependent charge were not provided to us. Mother's counsel stated during arguments at the termination hearing that Mother pleaded guilty and "there was no ad-

14, 2001, Mother pleaded guilty to neglect of a dependent as a class D felony and theft as a class D felony.[2] The trial court sentenced Mother to three years in the Indiana Department of Correction on each count with two years suspended on each count and with the sentences to be served concurrently. Mother was incarcerated from January of 2002 through March of 2002. In an unrelated case, Mother was also charged with forgery as a class C felony.[3] Mother entered into a conditional negotiated plea agreement to plead guilty to theft as a class D felony. However, at the time of the termination hearing, the trial court had not yet approved the plea agreement or sentenced Mother.

On May 6, 2002, after a hearing, the trial court granted the petition for involuntary termination of Mother's parental rights. The trial court held that there was a reasonable probability that:

(1) the conditions that resulted in the child's removal or the reasons for the placement outside the parent's home will not be remedied in that [Mother] has mental health problems, specifically probable Munchausen's Syndrome by Proxy and antisocial and histrionic personality disorders which are not likely to be amenable to treatment by psychotherapy or other means. [Mother] has expressed the belief that she has no problems which need to be addressed and has steadfastly insisted in her belief that [J.W.] received opiates and barbiturates at the home of his paternal grandparents, even though [J.W.] has been

back in that home for almost two years and has suffered none of the illnesses he suffered while in [Mother's] care. Furthermore, [Mother] has left the area for more than four months at a time without having contact with [J.W.] or requesting visitation and has been convicted of theft and child neglect (resulting from the situation which led to the underlying CHINS action). These convictions resulted in her not having contact with [J.W.] during her incarceration. She is currently awaiting sentencing on another theft conviction which has the potential of further incarceration.

(2) continuation of the parent-child relationship poses a threat to the well-being of [J.W.] in that [Mother's] mental illness puts the child at risk of being harmed if [J.W.] has unsupervised contact with [Mother]. The current divorce decree is dependent on the child in need of services case involvement. [J.W.] has been reunified with [Father] for almost two years, but if [Mother's] rights are not terminated [J.W.] is at risk for being placed back in the care of [Mother], which is potentially physically and psychologically dangerous or life-threatening for [J.W.]

Appellant's Appendix at 30–31. Further, the trial court found that termination was in J.W.'s best interests because he "is very young and unable to protect himself form harm in the event that [Mother] is allowed unsupervised contact." *Id.* at 31.

mission ... that she drugged that baby, it was more based upon the fact of the baby's ... general health." Transcript at 43. However, Mother also states in her Appellant's Brief that she pleaded guilty to the neglect of J.W. "in allowing [the drugging incident] to happen." Appellant's Brief at 12.

**2.** Ind.Code § 35–43–4–2(a) (1998).

**3.** Ind.Code § 35–43–5–2 (1998).

■ The sole issue is whether the evidence is sufficient to support the termination of Mother's parental rights to J.W. Initially, we note that the purpose of terminating parental rights is not to punish parents, but to protect the children. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind.1992). "Although parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their responsibilities as parents. This includes situations not only where the child is in immediate danger of losing his life, but also where the child's emotional and physical development are threatened." *Id.*

■ When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Doe v. Daviess County Div. of Children & Family Servs.*, 669 N.E.2d 192, 194 (Ind.Ct.App.1996), *trans. denied.* Rather, we will consider only the evidence and reasonable inferences therefrom which are most favorable to the judgment. *Id.* Where the trial court has entered findings of fact, as it did here, we engage in a two-tiered standard of review. *Id.* First, we determine whether the evidence supports the findings. *Id.* Next, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's findings and judgment only if they are clearly erroneous. *Id.* A finding is clearly erroneous when there are no facts or inferences drawn therefrom that support it. *In re D.G.*, 702 N.E.2d 777, 780 (Ind.Ct.App.1998). A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *CSX Transp., Inc. v. Rabold*, 691 N.E.2d 1275, 1277 (Ind. Ct.App.1998), *trans. denied.* "When the trial court enters such findings sua sponte, the specific findings control only as to the issues they cover, while a general judgment standard applies to any issue upon which the court has not found." *In re J.W.W.R.*, 712 N.E.2d 1081, 1083 (Ind.Ct. App.1999), *trans. denied.*

■ To involuntarily terminate a parent-child relationship, the State must establish the elements of Ind.Code § 31–35–2–4(b) (2001) by clear and convincing evidence. *Doe*, 669 N.E.2d at 194. Specifically, the State must prove the following by clear and convincing evidence:

(A) one (1) of the following exists:

  (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;

  (ii) a court has entered a finding under IC 31–34–21–5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or

  (iii) after July 1, 1999, the child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months;

(B) there is a reasonable probability that:

  (i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

  (ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

I.C. § 31–35–2–4.

Mother does not dispute that J.W. has been removed from her care for at least six months under a dispositional decree or that the DCOFC has a satisfactory plan for the care and treatment of J.W. Rather, Mother argues that the DCOFC failed to present clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in J.W.'s removal from Mother's care will not be remedied; (2) there is a reasonable probability that the continuation of Mother's parental relationship with J.W. poses a threat to J.W.'s well-being; and (3) termination of Mother's parental rights is in J.W.'s best interests. We address each argument separately.

### A.

■ Mother first argues that the trial court's conclusion that there was a reasonable probability that the conditions that resulted in J.W.'s removal from Mother's care will not be remedied is clearly erroneous. To determine whether there is a reasonable probability that the conditions which resulted in the removal of a child will not be remedied, the trial court should judge a parent's fitness to care for the child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re L.S.*, 717 N.E.2d 204, 209 (Ind.Ct.App.1999), *reh'g denied, trans. denied.* Due to the permanent effect of termination, the trial court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.*

In concluding that a reasonable probability existed that the conditions resulting in J.W.'s removal would not be remedied, the trial court relied upon: (1) Mother's mental health problems, which the trial court noted are not likely to be amenable to treatment by psychotherapy or other means; (2) Mother's belief that she has no problems which need to be addressed; (3) Mother's belief that J.W. received the contaminated baby food at the home of his paternal grandparents, even though J.W. has been living in that home for almost two years and has suffered none of the illnesses he suffered while in Mother's care; (4) Mother's sudden absence from the state for several months; and (5) Mother's criminal history.

Mother argues that the trial court failed to consider changed conditions, specifically, improvements in her parenting skills. As noted above, the trial court was required to consider Mother's fitness to care for J.W. at the time of the termination hearing and to take into consideration evidence of changed conditions. The only evidence of changed conditions was Mother's improvement in her parenting skills during her supervised visits. However, even with this improvement, the therapist supervising the visits between Mother and J.W. had concerns regarding Mother's mental health and erratic behavior.

The trial court was also required to evaluate Mother's habitual patterns of conduct. The evidence regarding Mother's habitual patterns of conduct revealed that while J.W. was living with Mother, he was admitted to the hospital and seen by his pediatrician numerous times. While in Mother's care in October of 1999, J.W. ingested baby food contaminated with prescription drugs. As a result, J.W. was removed from Mother's care, and his illnesses have not recurred. In January of 2001, Mother was diagnosed with probable Munchausen's syndrome by proxy, which is not typically treatable, an antisocial personality disorder, and a histrionic personality disorder.

Shortly after receiving Dr. Blix's diagnosis, Mother left Indiana without informing DCOFC or her family where she was going. Mother did not return to Indiana or request a visit with J.W. until June of 2001. Additionally, on December 14, 2001, Mother pleaded guilty to neglect of a dependent as a class D felony and theft as a class D felony. As a result, she was incarcerated from January of 2002 through March of 2002. Mother was also charged with forgery as a class C felony. She entered into a conditional negotiated plea agreement to plead guilty to theft as a class D felony. However, at the time of the termination hearing, the trial court had not yet approved the plea agreement or sentenced Mother.

Mother contends that the DCOFC failed to prove by clear and convincing evidence that Mother had a mental illness at the time of the termination hearing because Dr. Blix's evaluation was performed in January of 2001 and the termination hearing was held in April of 2002. Mother also argues that the diagnosis of Munchausen's syndrome by proxy was not proven by clear and convincing evidence because Dr. Blix made a diagnosis of "probable" Munchausen's syndrome by proxy and Mother consistently denied drugging J.W. However, Dr. Blix testified that she made a "probable" diagnosis of Munchausen's syndrome by proxy because it is difficult to diagnose the condition unless "you catch them in the act" of harming the child or the child "remains well when absent from that particular ... caretaker." Appellee's Appendix at 52–53. Mother's arguments simply amount to a request that we reweigh the evidence, which we will not do. *See, e.g., In re K.H.*, 688 N.E.2d 1303, 1305 (Ind.Ct.App.1997). Even though several months passed between the evaluation and the termination hearing, the evaluation was still relevant to the trial court's determination. The trial court was entitled to determine the weight to be given to Dr. Blix's diagnosis, the time between the evaluation and the termination hearing, and Mother's denials.

■ Finally, Mother argues that the trial court's reliance on her criminal convictions and pending charges is misplaced because "the criminal charges are not related to the conditions resulting in J.W.'s removal." Appellant's Brief at 11. We disagree. Mother's conviction for neglect of a dependent certainly relates to J.W. Mother states in her Appellant's Brief that she pleaded guilty to the neglect of J.W. "in allowing [the drugging incident] to happen." *Id.* at 12. Although her remaining criminal history may not relate to the drugging incident, the criminal history is relevant in determining whether the conditions that resulted in J.W.'s removal are likely to be remedied. *See, e.g., In re M.B.*, 666 N.E.2d 73, 77 (Ind.Ct.App.1996) (holding that ample evidence, including the father's extensive criminal history, suggested that his habitual patterns of conduct posed a substantial probability of future neglect or deprivation of the children), *trans. denied.*

It is clear that the trial court gave more weight to the evidence regarding Mother's mental health and patterns of conduct than to Mother's improvement in her parenting skills during supervised visits with J.W. We cannot say that the trial court's conclusion that there was a reasonable probability that the conditions that resulted in J.W.'s removal or the reasons for placement outside Mother's home would not be remedied is clearly erroneous. *See, e.g., Bergman v. Knox County Office of Family & Children*, 750 N.E.2d 809, 812 (Ind.Ct. App.2001) (holding that it was clear that the trial court gave more weight to the abundant evidence on the mother's pattern of conduct in neglecting her children dur-

ing the several years prior to the termination hearing than the mother's evidence that she had changed her life to better accommodate the children's needs).

### B.

■ Mother also argues that the trial court erred by finding that the continuation of her parent-child relationship with J.W. posed a threat to J.W.'s well-being. Ind.Code § 31–35–2–4(b)(2) required the DCOFC to demonstrate by clear and convincing evidence a reasonable probability that *either:* (1) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied, *or* (2) the continuation of the parent-child relationship poses a threat to the well-being of the child. The trial court specifically found that there was a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents would not be remedied, and there is sufficient evidence in the record to support the trial court's conclusion. *See supra* Part A. Thus, as Mother acknowledges, we need not determine whether the trial court's conclusion that the continuation of the parent-child relationship posed a threat to J.W. is clearly erroneous. *See, e.g., In re T.F.*, 743 N.E.2d 766, 774 (Ind.Ct.App.2001), *trans. denied.*

### C.

■ Next, Mother argues that the trial court's conclusion that termination of her parental rights was in J.W.'s best interests is clearly erroneous. The trial court found that termination of the parent-child relationship was in J.W.'s best interests because he "is very young and unable to protect himself from harm in the event that [Mother] is allowed unsupervised contact." Appellant's Appendix at 31. In determining what is in the best interests of the child, the trial court is "required to look beyond the factors identified by the office of family and children, and to look to the totality of the evidence." *T.F.*, 743 N.E.2d at 776. In so doing, the trial court must subordinate the interests of the parents to those of the child. *Id.* However, the trial court need not wait until the child is irreversibly influenced such that his or her physical, mental and social growth is permanently impaired before terminating the parent-child relationship. *Id.*

Mother first argues that that evidence is inadequate to show that she is a danger to J.W. Mother relies upon her denial that she drugged J.W. and the DCOFC's failure to show her "present state of mind." Appellant's Brief at 11–12. Mother again simply invites us to reweigh the evidence and judge the credibility of the witnesses, which we will not do. *See, e.g., K.H.*, 688 N.E.2d at 1305.

Mother also focuses on the fact that her parental rights were terminated while J.W. was residing with Father. Mother argues that because J.W. was living with Father, "[t]his is not a case where J.W. risks languishing in foster care while his mother works on her suitability as a guardian." Appellant's Brief at 15. Mother contends that the termination was based upon a "misguided concern" that J.W. could be placed in Mother's unsupervised care if Mother's rights were not terminated. *Id.* Rather, Mother asserts that if a concern still existed, the status quo could have been preserved and supervised visits with Mother could have continued.

■ In support of her argument, Mother states that "the most compelling evidence relating to J.W.'s best interest appears to be our statutory scheme which recognizes that termination of parental rights might not be appropriate where the child is already residing with one of his

parents." *Id.* at 14. Mother is referring to Ind.Code § 31–35–2–4.5 (2001), which requires a motion to dismiss the petition to terminate parental rights to be filed if:

the current case plan prepared by or under the supervision of the county office of family and children under IC 31–34–15 has documented a compelling reason, based on facts and circumstances stated in the petition or motion, for concluding that filing, or proceeding to a final determination of, a petition to terminate the parent-child relationship is not in the best interests of the child. A compelling reason *may* include the fact that the child is being cared for by a custodian who is a parent, stepparent, grandparent, or responsible adult who is the child's sibling, aunt, or uncle or a relative who is caring for the child as a guardian.

(emphasis added).[4] However, we have held that this permissive language does not *require* that the trial court dismiss a petition. *See M.H.C. v. Hill,* 750 N.E.2d 872, 878 (Ind.Ct.App.2001) (holding that the trial court was not required to dismiss the petition to terminate the father's parental rights even though the child was being cared for by his aunt). Thus, the fact that J.W. is being cared for by Father does not provide conclusive evidence that termination of Mother's parental rights is not in J.W.'s best interests.

The DCOFC points out that if Father became unable to care for J.W. through death or debilitating illness, Mother could regain custody of J.W., placing him at risk again. Appellee's Brief at 12 (citing *In re Guardianship of B.H.,* 770 N.E.2d 283, 287 (Ind.2002) (holding that "before placing a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement"), *reh'g denied*). According to the DCOFC, a nonparent would have to overcome a presumption in favor of Mother by clear and convincing evidence, which would be difficult because access to child abuse and neglect records is limited by Ind.Code § 31–33–18–2 (1998). Moreover, the DCOFC asserts that keeping J.W. a ward of the state indefinitely is not in J.W.'s best interests, the father's best interests, or the state's best interests. We agree. Making J.W. a ward of the state indefinitely is not in J.W.'s best interests. *See, e.g., M.H.C.,* 750 N.E.2d at 878 (rejecting a father's argument that it was not in the best interests of his child to terminate his parental rights because the trial court could have simply made the child's aunt a permanent guardian).

We conclude that the record contains clear and convincing evidence that termination of Mother's parental rights is in J.W.'s best interests. While in Mother's care, J.W. was hospitalized and seen by a pediatrician on several occasions. In particular, seven-month-old J.W. was hospital-

---

4. Ind.Code § 31–35–2–4.5 only applies to a child in need of services if the child:

(A) has been placed in:
(i) a foster family home, child caring institution, or group home licensed under IC 12–17.4; or
(ii) the home of a person related to the child (as defined in IC 12–7–2–162.5); as directed by a court in a child in need of services proceeding under IC 31–34; and

(B) has been removed from a parent and has been under the supervision of a county office of family and children for not less than fifteen (15) months of the most recent twenty-two (22) months, excluding any period not exceeding sixty (60) days before the court has entered a finding and judgment under IC 31–34 that the child is a child in need of services.

ized on one occasion after he ingested baby food contaminated with a prescription drug. Since his removal from Mother's care, J.W. has not had instances of severe illnesses. Mother was diagnosed with probable Munchausen's syndrome with proxy, which is not typically treatable although some people respond to therapy. Dr. Blix recommended that any visits between J.W. and Mother be supervised and that Mother never have custody of J.W. Although Mother points out that the guardian ad litem recommended that supervised visitation continue, the guardian ad litem specifically stated that she agreed "with the termination of parental rights." Transcript at 40.

The totality of the evidence demonstrates that the trial court's conclusion that termination of Mother's parental rights is in J.W.'s best interests is not clearly erroneous. *See, e.g., T.F.,* 743 N.E.2d at 776 (holding that the record contained sufficient evidence that termination of the parents' rights was in the best interests of the children). Consequently, we find sufficient evidence in the record to support the trial court's conclusion that the DCOFC proved the statutory elements by clear and convincing evidence. The trial court's judgment terminating Mother's parental rights to J.W. was not clearly erroneous. *See, e.g., id.* (holding that "the trial court was justified in concluding that the MCOFC proved by clear and convincing evidence that [the parents'] rights should be terminated").

For the foregoing reasons, we affirm the trial court's termination of Mother's parental rights to J.W.

Affirmed.

KIRSCH and SULLIVAN, JJ., concur.