892 N.E.2d 144 (2008)
In re the Termination of the Parent-Child Relationship of R.H., a minor child, and Bethany Manfred, the child's mother and Sean Hansen, the child's father,
Sean Hansen, Appellant-Respondent,
v.
Porter County Office of Family and Children, Appellee-Petitioner,
Court Appointed Special Advocate Program of Porter County, Appellee.
No. 64A03-0801-JV-14.
Court of Appeals of Indiana.
May 27, 2008.
Publication Ordered July 25, 2008.
*145 Clay M. Patton, Gordon A. Etzler & Associates, Valparaiso, IN, Attorney for Appellant.
John P. Shanahan, Indiana Department of Child Services, Valparaiso, IN, Attorney for Appellee.

OPINION
BAKER, Chief Judge.
Appellant-respondent Sean Hansen appeals the trial court's order terminating his parental relationship with his minor son, R.H., arguing that there is insufficient evidence supporting the order. We find that the evidence relied upon by the trial court is insufficient to support the termination of Sean's parental rights, though we observe that it may be relevant to issues of custody and/or guardianship of R.H. We reverse and remand for proceedings consistent with this opinion.

FACTS
Bethany Manfred and Sean Hansen are the parents of R.H., who was born on October 19, 2002. Sean and Bethany signed a paternity affidavit at the time of R.H.'s birth attesting that Sean is his father.
From the time of his birth until January 2003, R.H. lived with both of his parents in Indiana. In January 2003, Sean moved to Alaska to find work and be close to his father and stepmother. In May 2003, after Sean had secured employment and housing, Bethany and R.H. moved to Alaska to be with Sean. In November 2003, having lived in Alaska for eight months, Bethany and R.H. moved back to Indiana. Sean remained in Alaska.
After returning to Indiana, Sean's mother and stepfather, who live in Indiana, became active participants in R.H.'s life, taking care of him nearly every weekend and some weeknights. Sean has a strained relationship with his mother and stepfather and refused to permit them to see R.H. during the three months following *146 R.H.'s birth when Sean was still living in Indiana.
On August 3, 2004, Porter County Department of Child Services (DCS) filed a petition alleging R.H. to be a Child in Need of Services (CHINS). At that time, Bethany and R.H. were living in a homeless shelter and Bethany had attempted to tamper with a drug screen required of all people staying in the shelter. Staff had also seen what appeared to be needle marks on Bethany's arms. Bethany was unemployed. R.H. was removed from Bethany's care and placed in foster care. In August 2004, R.H. was placed with his paternal grandmother and her husband and he has lived with them since that time. After R.H. was removed from Bethany's care, she visited R.H. once, cancelled two visits, and failed to show up for four other visits. She tested positive for cocaine and failed to complete drug treatment programs several different times. DCS has had no contact with Bethany for over two years and is unaware of her current whereabouts.
The goal of the CHINS proceeding was to reunify R.H. with Sean. To that end, DCS hoped to encourage Sean to relocate to Indiana to participate in reunification services and engage in a bonding process with his child, who he did not see for nearly two years after R.H. was removed from Bethany's care.
Although Sean remained in Alaska during the CHINS proceedings, he completed all court-ordered services and attended all court hearings in person or telephonically. R.H.'s guardian ad litem (GAL) spoke to Sean on the telephone between twenty and thirty times over the course of two years. Sean underwent a psychological evaluation, which revealed that he is psychologically healthy and did not reveal any major problems that would impede reunification with R.H. Sean also attended two multi-week parenting classes and participated in a court-ordered bonding assessment. A home study on Sean's residence in Alaska found that his home is suitable for R.H.
On May 23, 2006, DCS filed a petition to terminate the parental rights of Bethany and Sean. The petition alleges that Sean lives in Alaska and had not attempted to reunify with R.H., that Sean had not had contact with R.H. for more than two years, and that Sean had failed to complete court-ordered services. After the petition was filed, Sean visited R.H. in October 2006 and March 2007.
The trial court held a hearing on the petition on May 1 and 3, 2007, and on September 28, 2007, an order was entered terminating the parental rights of Bethany and Sean. In pertinent part, the order provides as follows:
17. ... Father has had limited contact with [R.H.] since Mother and the child left Alaska in November 2003....
18. The Court finds that Father has had two visits with [R.H.] since November 2003, the visit previously described in October 2006, as well as a visit in March 2007 when Father came to Indiana for a bonding assessment. Aside from the two visits, Father has made five telephone calls to [R.H.] at Grandmother's home since November 2003.... Father blames his lack of additional phone calls on time difference difficulties and the fact that making such calls was still "emotionally hard." Father wants to reintroduce [R.H.] into his life, but is unwilling to move to Indiana to do so.... Aside from these few calls and visits, Father has made no other effort to contact [R.H.] through cards, letters, etc....

*147 * * *
20. The Court finds Father's support system in Seward[, Alaska] includes [R.H.'s] paternal grandfather and his wife, whom [R.H.] came to know during his six[-]month stay in Alaska in 2003. A home study was completed on Father's home ... and came out favorably.... In addition, Father has recently completed the other tasks required of him, including a psychological evaluation and two parenting classes, one an eight[-]week class, the other a four[-]week class.
* * *
23. ... The Court finds .... that [R.H.] is bonded with Grandmother and her husband, and is not bonded with Father.
24. ... The Court finds ... that removing [R.H.] from an environment where he is bonded, as he is with Grandmother and her husband, and placing him in an environment where no bond exists, such as with Father, would be detrimental to [R.H.'s] mental well-being, now and for the future.
* * *
27. The Court finds there was no mental, physical, financial or other means which can explain father's failure to participate in services, visit with his son or work toward reunification.
28. The permanency plan in this case is termination of the parent-child relationship and the adoption by Grandmother and her husband.
29. ... The Court finds [the GAL] had a fair amount of contact with Father over the telephone throughout the case, talking with Father 20-30 times over two years, and meeting him once in person.... The Court finds ... that during their multiple phone conversations, Father seemed to always want to talk about Mother's problems, his problems with Grandmother, his employment, and various other topics, but Father never asked about [R.H.].... The Court finds that [the GAL] continually encouraged Father to come back to Indiana, even offering Father a place to stay at his own home, yet Father always refused....
* * *
31. ... Father lives in Alaska and has made no attempts for reunification with the child, Father had not had contact with [R.H.] in over two years [before the termination petition was filed], and Father had failed to complete Court Ordered Services.
* * *
33. The Court finds that the Father chose not to follow the recommendations set out above by failing to have contact with his son (even though he had the financial resources to travel from Alaska to Indiana). The Father's recent limited attempts to participate are far too little and too late. The son's need for permanency clearly outweighs the Father's parental rights. The Court finds ... that it would be disastrous to the child's emotional and mental well being to be separated from the only parents he has known, paternal Grandmother and Step-Grandfather.

*148 * * *
DISCUSSION AND RECOMMENDATIONS
* * *
As to Father, circumstances have changed a bit [since R.H. was removed from Bethany's care]. Father did complete the services required by the Court, and it may no longer be said that Father has had no contact with [R.H.] for over two years. However, the contact that has been made has been minimal, even though he is aware of the termination proceedings. Father also remains in Alaska.
... Father has lived in the same place as [R.H.] for less than a year total, immediately after [R.H.'s] birth, and during the six months that [R.H.] and Mother lived with Father in Alaska. Following [R.H.'s] return with Mother in November 2003, Father did not again see [R.H.] until October of 2006, at the time of the initial hearing for this very proceeding. This is a time span of nearly three years, the majority of [R.H.'s] young life, that Father was almost completely absent, save one phone call on [R.H.'s] third birthday. During this entire time period, Father was in contact with [the GAL], yet he failed to ever even ask how his child was doing. Father was always more concerned with his and Mother's problems, and placing the blame everywhere but on himself. Father has visited with [R.H.] one time after that October 2006 visit, and has made an effort to be involved in this termination proceeding, which are good things. It is also clear that making the trip from Alaska to Indiana is not a cheap or easy task, yet Father has made the trip a couple [of] times fairly recently, again, for different hearings or appointments related to this termination proceeding. However, these two visits Father has had in the last six months or so are the only visits he has made in almost three years.
More telling than that fact is the fact that Father has made only five phone calls to [R.H.] during that time period, and has sent no cards or letters of any kind during the same.... Add it all up, and from the time [R.H.] and Mother left Alaska in November 2003, until the date of this hearing, May 1, 2007, there were two visits and five phone calls, and nothing else.
Father refuses to return to Indiana to stay for multiple reasons, and it may be understandable that it is difficult to afford making the trip from Alaska to Indiana very often. However, this does not excuse the fact that Father has not placed more phone calls, or made some other effort at communication.... The evidence shows that Father lacks sufficient concern for his child's well-being to maintain contact with him.... Father has not shown that he is completely committed to being [R.H.'s] father. Father's continued lack of significant communication and efforts at contact are clear and convincing evidence that there is a reasonable probability that the reasons for placement outside the home of the parents will not be remedied, and that the continuation of the parent-child relationship poses a threat to the well-being of [R.H.], as well as a threat to his emotional development.
... [R.H.] has developed a strong bond with [his paternal grandmother and her husband], and no bond at all with Father or Mother. Taking [R.H.] out of a situation where he has formed such a strong bond, and placing him somewhere where he lacks such a strong bond, would have a serious detrimental effect on his future. [R.H.] has also experienced stability in this placement, *149 which is something neither Mother nor Father may be able to provide....
Appellant's App. p. 11-23. Sean now appeals.

DISCUSSION AND DECISION
As we consider Sean's argument that the trial court erroneously terminated his parental relationship with R.H., we observe that we will not set aside the trial court's judgment terminating a parent-child relationship unless it is clearly erroneous. In re A.A.C., 682 N.E.2d 542, 544 (Ind.Ct.App.1997). We neither reweigh the evidence nor judge the credibility of witnesses, and we will consider only the evidence that supports the trial court's decision and the reasonable inferences that may be drawn therefrom. Id. If the evidence and the inferences support the trial court's decision, we must affirm. In re L.S., 717 N.E.2d 204, 208 (Ind.Ct.App. 1999).
We acknowledge that the involuntary termination of parental rights is the most extreme sanction a court can impose on a parent because termination severs all rights of a parent to his or her children. Id. Therefore, termination is intended as a last resort, available only when all other reasonable efforts have failed. Id. The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Id. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities. Id.
To effect the involuntary termination of a parent-child relationship, the State must present clear and convincing evidence establishing the following elements:
(A) one (1) of the following exists:
(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
(ii) a court has entered a finding under IC XX-XX-XX-X.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
(iii) after July 1, 1999, the child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months;
(B) there is a reasonable probability that:
(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or
(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;
(C) termination is in the best interests of the child; and
(D) there is a satisfactory plan for the care and treatment of the child.
Ind.Code § 31-35-2-4(b)(2).
In construing this statute, this court has held that when determining whether certain conditions that led to the removal of the children will be remedied, the trial court must judge the parent's fitness to care for the children at the time of the termination hearing, taking into consideration evidence of changed conditions. In re D.J., 755 N.E.2d 679, 684 (Ind.Ct. App.2001). A parent's habitual pattern of conduct must also be evaluated to determine the probability of future negative *150 behavior. Id. The trial court need not wait until a child is irreversibly harmed such that his physical, mental, and social development are permanently impaired before terminating the parent-child relationship. Id.
Additionally, the trial court may consider the services offered as well as the parent's response to those services. Id. Parental rights may be terminated when parties are unable or unwilling to meet their responsibilities. Ferbert v. Marion County OFC, 743 N.E.2d 766, 776 (Ind.Ct. App.2001). Also, when determining what is in the best interests of the children, the interests of the parents are subordinate to those of the child. Id. at 773. Thus, parental rights will be terminated when it is no longer in the child's best interests to maintain the relationship. In re B.D.J., 728 N.E.2d 195, 200 (Ind.Ct.App.2000).
Here, Sean did everything that was asked of him. DCS and the trial court both acknowledge that Sean completed all court-ordered services. Appellee's Br. p. 10; Appellant's App. p. 14. Furthermore, there were successful outcomes to those services  his psychological evaluation revealed no problems, he completed two multi-week parenting classes, his residence was found to be a suitable place for R.H. to live, and he was found to have a suitable support system in Alaska consisting of his father and stepmother. Appellant's App. p. 12. Sean also attended all hearings either in person or telephonically and stayed in touch with R.H.'s case managers and the GAL. Indeed, Sean spoke to the GAL twenty to thirty times and met with him once in person during the course of these proceedings.
The termination order essentially rests on three conclusions: (1) Sean has not made a sufficient effort to communicate and bond with R.H.; (2) on a related note, Sean has refused to move to Indiana; and (3) it would be traumatic to R.H. to have to leave his grandparents, to whom he is strongly bonded, to live with Sean, with whom he is not bonded. As for Sean's lackluster efforts at communicating with R.H., he is far from a model parent. He has neither phoned nor visited as much as he should have and he has never sent cards or letters to his son. But he has not abandoned R.H. He has done more than the bare minimum, and his efforts have increased markedly since the termination petition was filed. Granted, it should not have taken such a drastic action to awaken him to the possibility that he could forever lose his son, but it is apparent that, having finally realized the seriousness of the situation, he did what he was able to do to salvage his relationship with R.H.
DCS also argues, and the trial court agrees, that Sean's refusal to relocate to Indiana supports the termination of his parental rights. We simply cannot reach that conclusion. This evidence would certainly be relevant to a custody and/or guardianship determination, but we simply cannot conclude that a parent's mere refusal to uproot himself from his home, his life, his family, and his job and move across the country supports the drastic, permanent, and extreme sanction of forever severing the parental relationship.
Finally, the trial court found that it would cause great trauma to R.H. to leave his grandparents in Indiana to move to Alaska to live with a father whom he barely knows. There is certainly sufficient evidence in the record supporting this conclusion. There is no reason, however, to assume that denying DCS's request to terminate Sean's parental rights necessarily means that R.H. would have to be uprooted from his grandparents and Indiana. Instead, a better approach that avoids the option of last resort  termination of the parent-child relationship  *151 would be to hold a hearing to determine whether, given the nature of R.H.'s respective relationships with his grandparents and his father, R.H.'s grandparents should have custody and be the guardians of their grandson, who will remain in Indiana. This arrangement would have the significant advantage of permitting R.H. to stay in a safe and stable environment while simultaneously providing the flexibility to develop a relationship with his father. In other words, no relationship need be severed and no permanent and irreversible decision need be made to protect R.H.'s best interests.
In sum, we find that although evidence of Sean's lackluster efforts to communicate and visit with R.H., Sean's refusal to relocate to Indiana, and R.H.'s strong bond with his grandparents would be relevant to a determination of custody and/or guardianship, it is insufficient on its own to support the radical act of severing the parent-child relationship. We acknowledge that we are not permitted to reweigh the evidence or judge witness credibility, and we have not done so. Instead, we have accepted all of the trial court's findings and conclusions  save the ultimate conclusion  as true, and have simply found that they do not support a decision to terminate Sean's parental rights. We remand, therefore, and leave the trial court with the option of holding a hearing to determine issues of custody and guardianship.
The judgment of the trial court is reversed and remanded for proceedings consistent with this opinion.
ROBB, J., concurs.
RILEY, J., dissents with opinion.
Judge RILEY, dissenting with separate opinion.
I respectfully dissent. The trial court's judgment is not clearly erroneous and it is firmly based on the evidence. The State has met the criteria necessary to terminate the parent-child relationship by clear and convincing evidence.

ORDER
Appellant Sean Hansen, by counsel, has filed a Motion to Publish.
Having considered the matter, the Court FINDS AND ORDERS AS FOLLOWS:
1. Appellant's Motion to Publish is Granted, and this Court's opinion handed down in this cause on May 27, 2008, marked Memorandum Decision, Not for Publication is now ORDERED PUBLISHED.
BAKER, C.J., RILEY, ROBB, JJ., concur.