**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**NANCY A MCCASLIN**
Elkhart, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**MATTHEW D. BOULAC**
DCS Elkhart County Office
Elkhart, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: K.C. and K.M., Jr. (Minor Children) and J.C. (Mother), B.D.T. (Father of K.C.) and K.M., Sr., (Father of K.M., Jr.),<br><br>     Appellants,<br><br>          vs.<br><br>THE INDIANA DEPARTMENT OF CHILD SERVICES,<br><br>     Appellee. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No.  20A03-1107-JT-314<br>)<br>)<br>)<br>)<br>)<br>) |

APPEAL FROM THE ELKHART CIRCUIT COURT
The Honorable Terry C. Shewmaker, Judge
The Honorable Deborah A. Domine, Juvenile Magistrate
Cause Nos.  20C01-1102-JT-8 and 9

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**DARDEN, Judge**

STATEMENT OF THE CASE

J.C. ("Mother") and B.T. ("Father I") appeal the juvenile court's termination of the parent-child relationship with their daughter, K.C. Mother and K.M., Sr., ("Father II"), appeal the termination of the parent-child relationship with their son, K.M.

We affirm.

ISSUE

Whether there is sufficient evidence to support the terminations of the parent-child relationships.

FACTS

On October 6, 2009, Mother, who was nine months pregnant, left one-year-old K.C. alone in a shopping cart in the middle of a Wal-Mart parking lot while Mother chased after Father II as he drove away in his car in the rain. After the chase, Mother went inside the store. Several minutes later, Mother asked a stranger to go outside and find her daughter in the parking lot and bring her inside the store. K.C. was soaking wet when the stranger found and carried her into the store. Witnesses called the police, and K.C. was taken into protective custody. A search of DCS records revealed a history of domestic violence between Mother and Father II as well as multiple investigations for their alleged drug use; K.C. was placed in foster care. Two days later, Mother admitted

2

that K.C. was a Child in Need of Services (CHINS), and K.C. was placed back in Mother's care. Father I was incarcerated with a projected release date of 2028.

Mother and Father II's son, K.M., was born on October 28, 2009, with TCH-positive meconium. At a hearing six weeks later, Mother admitted that K.M. was also a CHINS. Following the hearing, both children were allowed to remain in Mother's care. Mother was also ordered to participate in individual therapy, complete a parenting assessment and follow recommendations, remain drug free, and remain in regular contact with the DCS case manager. At a later hearing, Father II, who is disabled and lives with his mother, also admitted that K.M. was a CHINS. The court ordered him to pay $12 per week in child support.

In January 2010, both children were removed from Mother's home after K.C. swallowed one of Mother's pills. The children were subsequently returned to Mother's home in April 2010. Mother and Father II were involved in domestic battery incidents in April and June 2010. During the April incident, one of the parents threw bleach, which splashed on one of the children. Both of the children were present during the incident, and Father II was arrested for domestic battery. On a hot day, at the end of June 2010, Mother left eight-month-old K.M. alone in the car for twenty minutes and was charged with felony neglect. At a July 2010 review hearing, the supervisor of the DCS case managers testified that Mother had had some issues with stable housing over the preceding months and had been residing in a hotel with the children before her arrest.

3

When Mother, Father I, and Father II (collectively "Parents") failed to follow through with DCS recommendations, DCS filed petitions in February 2011 to terminate the parent-child relationship between Parents and children. At the June 2011 termination hearing, clinical psychologist Dr. Jay Shetler testified that Mother is psychologically unstable and has a pattern of abusive relationships with men that have criminal histories. According to Dr. Shelter, these relationships place Mother's children at risk. Cass County Department of Human Services supervisor Sara Whitmyer testified that Mother's three oldest children were removed from Mother's home in 2006. At the time, Whitmyer was also concerned that Mother failed to accept responsibility for her actions and that her relationships placed her children at risk of harm. Mother's parental rights to those three children were eventually involuntarily terminated.

Family consultant Jacob Fawley explained that Mother had difficulty maintaining a job. For example, Mother worked at Long John Silver's for no more than a week when she was fired for having problems with her co-workers. She worked for a week at Big Lots but was fired when the employer discovered that Mother had a felony conviction she failed to list on her job application. Fawley expressed his concerns that Mother had never shown enough financial stability to care for the children. Fawley was also concerned that Mother was evicted from housing and was unable to keep utilities on in the winter months.

According to Psychologist Dr. Anthony Berardi, Father II has long-term problems with marijuana and domestic violence, as well as a history of "really not being able to

4

stand on his own two feet . . . ." Tr. at 141. Justin Glick, family consultant at Lifeline Youth and Family Services, supervised Father II's visits with the children and was Father II's case manager to set vocational and independent functioning goals. According to Glick, Father II lives with his mother, does not have a job, and is not able to function independently.

According to DCS caseworker Danielle Yeager, the situation surrounding the removal of the three oldest children and the termination of Mother's parental rights in 2006 is similar to Mother's current situation with K.C. and K.M. Yeager explained that Mother and Father II have not complied with the recommendations in their cases. The last time Mother saw K.C. and K.M. was on June 30, 2010. At the time of the termination hearing, she was incarcerated and had a history of charges including battery by bodily waste, battery on a police officer, resisting law enforcement, domestic battery, and violation of probation, neglect of a dependent, theft, escape, disorderly conduct, contempt, and welfare fraud. Father I has never met K.C. and after the CHINS hearing, he asked not to be transported from prison to any further hearings concerning K.C. His prison release date is not until 2028. Father II is still on probation. At the time of the hearing, he had a probation violation hearing set, and a charge of battery pending against him. He had been arrested multiple times throughout the case.

Lastly, the evidence revealed that the children have bonded with their foster parents, and it would be detrimental to both children to remove them from their foster parents. The plan for the children is adoption by the foster parents.

5

Following the hearing, the juvenile court issued an order terminating the Parents' parental rights. Parents appeal.

## DECISION

The purpose of terminating parental rights is not to punish parents but to protect their children. *In re D.D.*, 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied*. Although parental rights are of a constitutional dimension, the law allows for the termination of those rights when parties are unable or unwilling to meet their responsibility as parents. *Id.*

The juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.*

Here, Parents argue that there is insufficient evidence to support the termination of their parental rights. This court will not set aside the juvenile court's judgment terminating a parent-child relationship unless the judgment is clearly erroneous. *Id.* at 929-30. When reviewing the sufficiency of the evidence to support an involuntary termination of a parent-child relationship, we neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* at 930. We consider only the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. *Id.*

6

Indiana Code section 31-35-2-4(b)(2) sets out the following relevant elements that DCS must allege and prove by clear and convincing evidence in order to terminate a parent-child relationship:

> (B)    that one (1) of the following is true:
> > (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> > (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> > (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services.
>
> (C)    that termination is in the best interests of the child; and
> (D)    that there is a satisfactory plan for the care and treatment of the child.

### 1.  Conditions Remedied

In this case, Parents specifically contend DCS failed to prove there is a reasonable probability that the conditions that resulted in their children's removal will not be remedied.

To determine whether the conditions are likely to be remedied, the juvenile court must judge a parent's fitness to care for his or her children at the time of the termination hearing and take into consideration any evidence of changed conditions. *D.D.,* 804 N.E.2d at 266. The court must also evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *Id.*

Here, our review of the evidence reveals the children were removed from Mother over two years ago. At the time of the termination hearing, Mother was incarcerated and

7

had an extensive legal history. She has never had stable housing or employment, and has a history of placing her children at risk with her abusive relationships with men. Her parental rights to her three oldest children were terminated five years ago. Father I is incarcerated until 2028. He has never met K.C. and asked not to be transported from prison to any further hearings concerning her. Father II has not complied with DSC's recommendations and has an extensive criminal history. He has never had stable employment and is not able to function independently.

Recognizing our deferential standard of review, we find this evidence supports the juvenile court's finding that there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied.[1]

## 2. Best Interests

Parents also contend that there is insufficient evidence that termination of the parent-child relationships is in the best interests of K.C. and K.M. A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that the continuation of the parent-child relationship is contrary to the child's best interests. *Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Here, Parents have historically been unable to provide

---

[1]Parents further argue that DCS failed to prove the continuation of the parent-child relationships poses a threat to the well-being of their children. However, because it is written in the disjunctive, the statute requires the juvenile court to find only one of the two requirements of subsection (B) by clear and convincing evidence. *In re L.S.,* 717 N.E.2d 204, 209 (Ind. Ct. App. 1999), *trans. denied*. Standing alone, the finding that there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied satisfies the requirement listed in subsection (B). *Id.* We therefore need not address Parents' argument that DCS failed to prove the continuation of the parent-child relationships poses a threat to the well-being of their children.

adequate housing, stability and supervision, and testimony at the hearing reveals that they are currently unable to do the same. Their argument therefore fails.

### 3. Satisfactory Plan

Lastly, Parents argue DCS failed to prove there is a satisfactory plan for the care and treatment of their children. This court has previously explained that the plan for the care and treatment of the child need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *In re L.B.,* 889 N.E.2d 326, 341 (Ind. Ct. App. 2008). Here, the DCS caseworker testified the plan for the care and treatment of K.C. and K.M. is adoption. This is a satisfactory plan. *See A.N.J.,* 690 N.E.2d at 722.

We reverse a termination of parental rights "only upon a showing of 'clear error' – that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and therefore affirm the trial court.

Affirmed.

BAKER, J., and BAILEY, J., concur.