**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**DONALD J. FREW**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**ALISA L. RUDE**
Indiana Department of Child Services
Fort Wayne, Indiana

**ROBERT J. HENKE**
Indiana Department of Child Services
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| C.K., | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 02A05-1110-JT-593 |
| | ) | |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Charles F. Pratt, Judge
Cause No. 02D08-1103-JT-54

**May 9, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

C.K. ("Mother") appeals the involuntary termination of her parental rights to her child claiming there is insufficient evidence supporting the trial court's judgment. We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of C.N.W., born in January 2000.[1] The facts most favorable to the trial court's judgment reveal that in May 2009, the local Allen County office of the Indiana Department of Child Services ("ACDCS") filed a petition alleging C.N.W. was a child in need of services ("CHINS"). During a hearing on the amended CHINS petition later the same month, ACDCS presented evidence establishing that C.N.W. had been a victim of molestation beginning when she was four-years-old by the son of her father's girlfriend. Although Mother had been made aware of the molestation, Mother never had C.N.W. medically examined and continued to allow C.N.W. to remain in contact with the perpetrator during C.N.W.'s visits with her father.

Additional evidence presented during the CHINS hearing revealed that at the time of the child's removal from Mother's care, C.N.W. had recently been accused of having molested a younger female cousin in March 2009 and regularly engaged in verbal and physical altercations with both Mother and C.N.W.'s bed-ridden maternal grandmother. In addition, Mother had failed to obtain counseling for C.N.W. despite a referral for services by ACDCS and had recently begun dating A.K., a sexual offender who was on

---

[1] C.N.W.'s biological father, D.W., voluntarily relinquished his paternal rights to C.N.W. in July 2011, and does not participate in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Mother's appeal.

2

parole after having spent four years incarcerated for molesting his former girlfriend's minor daughter.

Mother admitted to the allegations of the amended CHINS petition and the child was so adjudicated. By agreement of the parties, the trial court proceeded to disposition the same day and entered an order formally removing C.N.W. from Mother's care and custody. The court's dispositional order also directed Mother to participate in and successfully complete a variety of tasks and services designed to improve her parenting abilities and to facilitate reunification with C.N.W. Among other things, Mother was ordered to: (1) maintain clean, safe, and appropriate housing at all times; (2) enroll in and successfully complete both family and individual counseling; and (3) ensure that C.N.W had no contact with A.K.

During the next several months, Mother's participation in court-ordered reunification services was sporadic and ultimately unsuccessful. Specifically, Mother's referrals for individual and family counseling at Family and Children Services were closed as unsuccessful due to Mother's non-compliance. Although Mother indicated that she planned to participate in a different counseling program through Park Center, Mother never provided ACDCS with any documentary proof of having participated and/or completed any counseling and ACDCS family case managers were likewise unable to independently verify Mother had participated in any counseling or therapy.

In addition to Mother's refusal to participate in court-ordered individual and family counseling through Family and Children's Services, Mother's attendance at scheduled visits with C.N.W. was inconsistent at times. Mother also continued her

3

personal relationship with A.K, and by September 2009, Mother had married A.K. despite ACDCS's admonishment that her marriage to a convicted sexual offender might negatively affect her ability to be reunified with C.N.W.

In March 2011, ACDCS filed a petition seeking the involuntary termination of Mother's parental rights to C.N.W. A two-day evidentiary hearing later commenced on July 19, 2011, and concluded the following day. During the termination hearing, ACDCS presented substantial evidence concerning Mother's failure to successfully complete a majority of the trial court's dispositional goals, including (1) successfully completing individual counseling to address Mother's own issues associated with being a victim of child molestation, as well as completing family counseling to learn how to properly parent C.N.W.; (2) taking her own medications for depression and anxiety as prescribed; and (3) demonstrating she is capable of establishing a safe and stable home independent of A.K.

Regarding the child, ACDCS presented significant evidence establishing that C.N.W. has been diagnosed with attention deficit hyperactivity disorder and bi-polar disorder. ACDCS's evidence further demonstrated that at the time of the termination hearing C.N.W. continued to struggle with significant emotional issues accompanied by violent behavior outbursts that were further exacerbated by her knowledge of Mother's refusal to leave A.K. Testimony also confirmed that C.N.W. needed permanency, structure, and specialized care in order to move forward and to thrive. Moreover, Guardian ad Litem ("GAL") Cory Spreen was adamant in his testimony that he could never recommend reunification between C.N.W. and Mother until such time as he was

4

certain Mother's relationship with A.K. was completely terminated based on C.N.W.'s history of being the victim of sexual abuse, coupled with Mother's past conduct of knowingly allowing C.N.W. to continue to be exposed to a situation where her child could be left alone with the same person who had molested her. Court-appointed special advocate (CASA) Brooke Neuhause likewise testified that termination of Mother's parental rights was in C.N.W.'s best interests due to the child's need for permanency and Mother's unchanged conditions.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On October 12, 2011, the trial court entered its judgment terminating Mother's parental rights. Mother now appeals.

## DISCUSSION AND DECISION

We begin our review by acknowledging that when reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

Here, in terminating Mother's parental rights, the trial court entered numerous detailed findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005).

5

First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. L.S., 717 N.E.2d at 208.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. K.S., 750 N.E.2d at 837. Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

Before an involuntary termination of parental rights can occur in Indiana, the State is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

6

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2010).[2]  The State's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'"  In re G.Y., 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)).  Moreover, Indiana Code section 31-35-2-8(a) provides that if a trial court finds that the allegations in a termination petition described in section 4 of Indiana's termination statute cited above are true, the court *shall* dismiss the petition.

Indiana Code section 31-35-2-4(b)(2)(B) provides that ACDCS need prove only one of the requirements of subsection (B) by clear and convincing evidence before the trial court may terminate parental rights.  Here, the trial court found that subsections (B)(i) and (B)(ii) of the termination statute were both established by the evidence, namely, that there is a reasonable probability the conditions resulting in C.N.W.'s initial removal from Mother's care will not be remedied and that continuation of the parent-child relationship poses a threat to C.N.W.'s well-being.  Mother, however, does not specifically challenge the evidence supporting the court's findings regarding either of these subsections on appeal.  Rather, Mother readily admits that she "changed the posture of her case" with regard to whether there is a reasonable probability that the conditions leading to C.N.W.'s removal will be remedied in the future "by marrying a registered sex offender after the underlying CHINS action had been filed."  Appellant's Br. at 5.

---

[2]  We observe that Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012).  The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

Mother likewise "concedes" that there was "ample testimony provided at trial indicating that [M]other's marriage to a registered sex offender seemed to pose a threat to the well[-]being of the child. . . ." Id. at 5-6. Nevertheless, Mother claims she is entitled to reversal because ACDCS family case manager Lauren Kingseed acknowledged during the termination hearing that she had never met Mother's husband and that he had never been "brought in to the underlying proceedings to find out whether he would cooperate . . . with the Parent Participation Plan" and/or whether he "actually represented a risk to the child." Id. at 6.

Mother fails to support her assertion with cogent reasoning or citation to authority, as is required by our appellate rules. See Ind. Appellate Rule 46(A)(8)(a). In failing to do so, as well as failing to challenge the evidence supporting the trial court's findings as to subsections (b)(2)(B)(i) and (ii) of the termination statute, Mother has waived review of this entire issue. See Ind. Code § 31-35-2-4(b)(2)(B); see also Davis v. State, 835 N.E.2d 1102, 1113 (Ind. Ct. App. 2005) (concluding that failure to present a cogent argument or citation to authority constitutes waiver of issue for appellate review), trans. denied. Waiver notwithstanding, given our preference for resolving a case on its merits, we shall review the sufficiency of the evidence supporting the trial court's findings with regard to Mother's argument set forth above, which can be reasonably viewed as a challenge to the trial court's determination that continuation of the parent-child relationship poses a threat to C.N.W.'s well-being. See I.C. 31-35-2-4(b)(2)(B).

We begin by observing that a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that her physical, mental, and social growth is

permanently impaired before terminating the parent-child relationship. In re E.S., 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate. Id. Here, the trial court's judgment contains multiple findings detailing Mother's unresolved parenting issues, mental health concerns, and failure to "put herself in a position to be able to provide [C.N.W.] with a safe, stable, home environment" thereby threatening C.N.W.'s emotional and physical development. Appellant's App. at 23. For example, the trial court found Mother had "enrolled in Park Center's Dialectical Behavioral Therapy Program, but did not complete it[,] nor ha[d] [Mother] completed individual or family counseling." Id. at 22. In addition, after noting that Mother revealed, for the first time during the termination hearing, that she, too, had been molested as a child and had begun having nightmares and flashbacks after learning that C.N.W. had also been molested, the trial court acknowledged Mother's admission that she had failed to "fully address[] the issues of her own molestation." Id. The trial court then found that the counseling services recommended by ACDCS "would have assisted [Mother] in dealing with her own victimization and would have assisted her in better understanding her daughter's needs in providing [C.N.W.] with a stable, safe home environment," but that Mother "failed and refused to participate in said services." Id. at 22-23.

As for Mother's ongoing relationship with A.K., the trial court found that, following C.N.W.'s removal from Mother's care, Mother "met and married [A.K.], who is a convicted sex offender," and who is "prohibited from having contact with children as

9

a result of his conviction." Id. at 21. The court further found that Mother had married A.K. despite ACDCS's clear admonishment that such action may impact Mother's ability to be reunited with C.N.W. because, as Mother testified, she "can't control who she loves." Id. The trial's court's findings also acknowledge testimony from service providers that Mother's "decision to marry [A.K.] has had a negative effect on [C.N.W.]," and that the child "blames herself for her removal from [Mother's] home and believes that her mother loves her husband more than she loves her." Id. at 23. Although the trial court noted that Mother had "verbalized that she would leave her husband in order to get her daughter back," it nevertheless found that Mother "has taken no affirmative steps to obtain her own home, to dissolve her marriage to [A.K.][,] or to file for a legal separation." Id. at 21.

A thorough review of the record leaves us satisfied that abundant evidence supports the trial court's findings cited above, which in turn support the court's determination that continuation of the parent-child relationship poses a threat to C.N.W.'s well-being and its ultimate decision to terminate Mother's parental rights. The evidence most favorable to the trial court's judgment discloses that Mother, who suffers from depression and anxiety, has steadfastly refused to participate in both individual and family counseling to address her own mental health concerns, as well as her admitted unresolved emotional issues stemming from the molestations she endured as a child, all of which have significantly impacted Mother's ability to parent effectively and to provide C.N.W. with a safe and stable home environment. Mother also admitted that she remained married to, living with, and financially dependent upon her husband, A.K., a

10

convicted sexual offender, notwithstanding the fact she had been "fully advised" that ACDCS would "never be in a position to allow or to recommend to the [trial court] to allow [A.N.W.] to come home with [Mother]" as long as she continued her relationship with A.K. Transcript at 66, 94.

Testimony from the GAL and CASA further supports the trial court's judgment. GAL Spreen informed the trial court that Mother's "on-going parental relationship" with C.N.W. was preventing the child from developing "healthy emotional relationships with any other person in a role of a caregiver because of the continued contact with the mother who says she's coming home." Id. at 144. Spreen further testified that C.N.W. needs "permanency" and "closure" of this case, and that he would never even consider the possibility of recommending reunification with Mother unless there was absolutely "no doubt that [A.K.] not only didn't live in the same residence as [M]other but no longer had any relationship at all with [M]other." Id. at 145. Spreen observed that C.N.W. had already been the victim of sexual molestation and that Mother had "continued to expose this young lady to a situation where [C.N.W.] she was potentially unmonitored with the person [Mother had] caught red-handed molesting her daughter." Id.

CASA Neuhause's testimony echoed that of GAL Spreen. In recommending termination of Mother's parental rights, Neuhause acknowledged C.N.W.'s substantial history of violent physical outbursts, significant and ongoing emotional needs, and Mother's current inability to meet these needs, stating that Neuhause did not believe Mother possessed the "ability and time that it would take to control" C.N.W.'s current

11

behaviors. Id. at 156. Neuhause also confirmed that she, too, believed C.N.W. needed permanency in order to move on with her life.

Again, a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. Based on the foregoing, we conclude that abundant evidence supports the trial court's finding that continuation of the parent-child relationship poses a threat to C.N.W.'s well-being, as well as its ultimate decision to termination Mother's parental rights. Moreover, Mother's assertion that the trial court committed reversible error in terminating her parental rights simply because ACDCS failed to meet with and/or offer services to A.K. via the Parent Participation Plan in order to determine whether he "actually represented a risk" is unpersuasive. Appellant's Br. at 6. We have previously explained that the provision of family services "is not a requisite element of our parental rights termination statute." In re E.E., 736 N.E.2d 791, 796 (Ind. Ct. App. 2000). A failure to provide services therefore "does not serve as a basis on which to directly attack a termination order as contrary to law." Id.

Affirmed.[3]

RILEY, J., and DARDEN, J., concur.

---

[3] Mother suggests in her "Statement Of The Issues Presented For Review" that she also challenges the sufficiency of the evidence supporting the trial court's findings as to the "best interests" and "satisfactory plan" elements of the termination statute. See I.C. § 31-35-2-4 (b)(2)(C) & (D). Mother fails, however, to make a single argument or citation to authority, statutes, Appendix, or parts of the Record on Appeal in support of any such contention. These issues are therefore waived. See, e.g., Davis, 835 N.E.2d at 1113 (Ind. Ct. App. 2005) (failure to present a cogent argument or citation to authority constitutes waiver of issue for appellate review), trans. denied; see also Ind. Appellate R. 46(8)(a).