**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS, Central Administration
Indianapolis, Indiana

**LUMINITA NODIT**
DCS, Tippecanoe County Local Office
Lafayette, Indiana

FILED

Aug 15 2012, 9:29 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF H.S. AND N.S., Minor Children, | ) ) ) ) | |
| and, | ) ) | |
| S.S. & D.S., Mother & Father, | ) ) | |
| Appellant, | ) ) | |
| vs. | ) ) | No. 79A02-1112-JT-1200 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee. | ) ) | |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Loretta Rush, Judge
The Honorable Faith Graham, Magistrate
Cause Nos. 79D03-1108-JT-104, 79D03-1108-JT-105,
79D03-1108-JT-106, and 79D03-1108-JT-107

**August 15, 2012**

**MATHIAS, Judge**

S.S. ("Mother") and D.S. ("Father") appeal the involuntary termination of their parental rights to their children, claiming there is insufficient evidence supporting the trial court's judgment. We affirm.

## Facts and Procedural History

Mother and Father are the biological parents of H.S., born in January 2010, and N.S., born in December 2010 (collectively referred to as "the children").[1] The facts most favorable to the trial court's judgment reveal that in January 2010, the local Tippecanoe County office of the Indiana Department of Child Services ("TCDCS") received a report stating H.S. had been born testing positive for methamphetamine. At the time of H.S.'s birth, Mother also tested positive for methamphetamine, marijuana, and opiates. TCDCS initiated an assessment during which caseworkers further learned that Father, who had just been released from incarceration, also had a significant history of substance abuse. As a result of its assessment, TCDCS took H.S. into protective custody and filed a petition alleging H.S. was a child in need of services ("CHINS").[2]

A detention and initial CHINS hearing (referred to herein as the "first CHINS case") was held on January 25, 2010. At that time, the trial court issued an order

---

[1] We observe that Mother and Father were not married at the time H.S. was born, but were subsequently married in March 2010.

[2] For clarification purposes we note that H.S. and N.S. have two step-siblings, C.K. and I.B., who were also removed from the family home during this first CHINS case involving H.S. The CHINS petitions involving C.K. and I.B. were later dismissed when a relative guardianship for both step-siblings was established. C.K. and I.B. are not subject to the trial court's judgment appealed herein.

authorizing H.S.'s removal from both parents and placement in relative care with the child's maternal grandparents upon H.S.'s release from the hospital. During a subsequent hearing, the parents admitted to the allegations of the CHINS petition and the child was so adjudicated.

Following a hearing in April 2010, the trial court entered a dispositional order directing both parents to participate in and successfully complete a variety of tasks and services in order to facilitate reunification of the family. Specifically, the parents were ordered to, among other things, remain drug-free, complete substance abuse and parenting assessments, and participate in home-based counseling services as well as supervised visitation with H.S. For the next several months, both parents failed to actively participate in the recommended services, and both parents continued to test positive for drugs. The parents ultimately consented to guardianship with the maternal grandparents and the first CHINS case was dismissed in July 2010.

In October 2010, TCDCS received a report alleging both parents were still using drugs and having unsupervised contact with H.S. During TCDCS's ensuing assessment, H.S. again tested positive for methamphetamine at such high levels that the child was unable to produce any subsequent clean drug screens until late April 2011. Father likewise tested positive for methamphetamine, and Mother was pregnant. Additionally, although the terms of the maternal grandparents' guardianship of H.S. specifically prohibited Mother and Father from having any unsupervised contact with H.S, the maternal grandparents eventually admitted that they had allowed both parents to have

3

unsupervised visits with H.S. As a result of the assessment, H.S. was taken into protective custody, and a second CHINS petition as to H.S. was filed.

Shortly after the second CHINS case was initiated as to H.S., N.S. was born testing positive for methamphetamine at extremely high levels. N.S. was therefore taken into emergency protective custody in December 2010, placed in licensed foster care along with H.S., and later adjudicated a CHINS. Similar services, including substance abuse evaluations and treatment, home-based case management services, psychological evaluations, parenting assessments, random drug screens, and supervised visitation with the children were again offered to both parents as part of the second CHINS case.

Mother and Father again failed to successfully complete services and continued to test positive for drugs. Additionally, neither parent secured employment or independent housing. Moreover, the relationship between the parents involved several incidents of domestic violence resulting in a broken finger to Mother in January 2011, an incident involving a knife in June 2011, and a physical altercation in June 2011 that resulted in stitches and a fractured arm for Mother. Father was also incarcerated on several occasions during the underlying CHINS case.

TCDCS eventually filed petitions seeking the involuntary termination of both Mother's and Father's parental rights to the children in August 2011. An evidentiary hearing on the termination petitions was held on November 2011. During the termination hearing, TCDCS presented substantial evidence demonstrating Mother's and Father's significant history of drug abuse, domestic violence, and neglectful conduct. TCDCS

4

also introduced evidence establishing both parents' unresolved substance abuse issues, refusal to consistently visit with the children throughout the duration of the underlying proceedings, and failure to complete a majority of the trial court's dispositional goals. Finally, TCDCS presented evidence that the children were happy, thriving, and living together in a pre-adoptive foster home.

At the conclusion of the termination hearing, the trial court took the matter under advisement. In December 2011, the court entered its judgment terminating Mother's and Father's parental rights to H.S. and N.S. Both parents now appeal.

## Discussion and Decision

We begin our review by acknowledging that when reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

Here, in terminating Mother's and Father's parental rights, the trial court entered specific factual findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we

determine whether the findings support the judgment. Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. L.S., 717 N.E.2d at 208.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. K.S., 750 N.E.2d at 837. Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

   (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

   (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

6

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2)(B)-(D).[3] The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)). "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added).

Here, Mother and Father's allegations of error focus solely on the issue of whether TCDCS proved it had a satisfactory plan for care and treatment of the children. Specifically, the parents assert that the trial court erred when it "made a factual finding that the children have 'resided with the foster family most of their lives.'" Appellant's Brief at 1. The parents also claim that the trial court "erred when it concluded that TCDCS had a satisfactory plan of adoption with persons other than the grandparents" and that such a "plan of adoption by non-relatives was in the children's best interest[s]." Id.

Initially, we observe that Mother and Father concede in their brief on appeal that the trial court's specific finding that the children had resided with the foster family most

---

[3] Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

of their lives was in fact true as to N.S., who was removed within weeks of the child's birth and placed in the current foster parents' home. Nevertheless, the parents insist that because H.S. spent the first ten months of his life living with his maternal grandparents before being placed in foster care, the court's finding, although "mathematically close, belies the nature and bond the children have with the grandparents[.]" Id. at 15.

The record confirms that upon the child's release from the hospital several weeks after his birth, H.S. was formally removed from the parents' care and placed in relative care with the maternal grandparents, who later obtained a legal guardianship over H.S. Approximately ten months later, however, H.S. was removed from the maternal grandparents and placed in the current foster home after testing positive for methamphetamine and amidst allegations[4] that the grandparents had violated the terms of the guardianship by allowing Mother and Father to babysit and/or have unsupervised visits with H.S. H.S. remained in the same foster care placement for the remainder of the CHINS and termination cases. We therefore agree with TCDCS that the parents' arguments here are "misplaced." Appellee's Br. at 21. Moreover, notwithstanding this finding's lack of technical correctness as to H.S., at least in part, our review of the record leaves us convinced that substantial additional evidence, apart from this challenged finding, supports the trial court's conclusion that TCDCS has a satisfactory plan for the care and treatment of both children, namely, adoption by their current foster care family.

---

[4] During the termination hearing, both maternal grandparents, as well as Mother, admitted that the parents did in fact have unsupervised visits with H.S. during the guardianship with the grandparents notwithstanding the court's order against such contact.

Indiana Code section 31-35-2-4(b)(2)(D) provides that before a trial court may terminate a parent-child relationship, it must find there is a satisfactory plan for the future care and treatment of the child. Id.; see also D.D., 804 N.E.2d at 268. It is well-established, however, that this plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. Id. Here, TCDCS's plan is for H.S. and N.S. to be adopted by their current foster parents who have expressed a desire to do so. This plan provides the trial court with a general sense of the direction of the children's future care and treatment. TCDCS's plan is therefore satisfactory. See id. (concluding that State's plan for child to be adopted by current foster parents or another family constituted suitable plan for future care of child).

The parents counter that allowing the children to be adopted by non-relatives is "not acceptable" given the "resources of the grandparents, the history of care with the grandparents, the bonds with the grandparents, and the unmeasurable [sic] destruction of the children's sense of family that will occur with a non-relative adoption." Appellant's Br. at 15. In so doing, the parents direct our attention to Indiana Code section 31-34-18-2(b), which requires TCDCS to consider placement with a "suitable and willing" relative before considering an out-of-home placement. Id. at 16.

Indiana Code section 31-34-18-2(b) provides:

If the department or caseworker believes that an out-of-home placement would be appropriate for a *child in need of services*, the department or caseworker shall consider whether the child should be placed with the

9

child's suitable and willing blood or adoptive relative caretaker, including a grandparent, an aunt, and uncle, or an adult sibling, before considering other out-of-home placements for the child.

Id. Notwithstanding the parents' contention, we point out that the statute cited above is a CHINS statute, and the parents are not appealing the trial court's adjudication that the children were determined to be CHINS. Thus, Indiana Code section 31-34-18-2 does not apply.

As previously explained, Indiana's termination statute requires TCDCS to establish only that "there is a satisfactory plan for the care and treatment of the child" in termination proceedings. Ind. Code § 31-35-2-4(b)(2)(D). Moreover, this court has repeatedly held that adoption is a "satisfactory plan" for the care and treatment of a child under the termination of parental rights statute. See In re B.M., 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009). In recommending termination of both Mother's and Father's parental rights to H.S. and N.S., the TCDCS caseworker testified during the termination hearing that the children were living together and bonded with their current foster parents, who have provided both children with a sense of security and are "able to show compassion and love and . . . a genuine interest in what the children are doing as well." Tr. p. 159. The caseworker further informed the trial court that TCDCS's plan for the children was adoption. We therefore conclude that TCDCS has established a satisfactory plan for the care and treatment of H.S. and N.S., namely, adoption, and the parents' contention that the trial court erred in failing to consider the children's placement with

10

either the maternal or paternal grandparents as an alternative to terminating parental rights must fail. See B.M., 913 N.E.2d at 1287.

This Court will reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." In re A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Public Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.[5]

VAIDIK, J., and BARNES, J., concur.

---

[5] As an aside, we note that although Mother and Father do not specifically challenge the trial court's order terminating their parental rights on any additional ground, our review of the record supports the trial court's determination that TCDCS presented clear and convincing evidence in support of its remaining allegations under Indiana Code section 31-35-2-4, including its best interests allegation, as to both children.