**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**CRAIG A. DECHERT**
Kokomo, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
Indiana Department of Child Services
Indianapolis, IN

**ALICIA C. CRIPE**
Indiana Department of Child Services
Kokomo, Indiana

**FILED**
Nov 09 2012, 9:19 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

|  |  |  |
|---|---|---|
| IN RE THE TERMINATION OF THE PARENT CHILD RELATIONSHIP OF D.T.: | ) | |
| | ) | |
| | ) | |
| S.T., | ) | |
|     Appellant-Respondent, | ) | |
| | ) | |
|         vs. | ) | No.  34A05-1205-JT-228 |
| | ) | |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) | |
| | ) | |
|     Appellee-Petitioner. | ) | |

APPEAL FROM THE HOWARD CIRCUIT COURT
The Honorable Lynn Murray, Judge
Cause No. 34C01-1112-JT-00439

**November 9, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**PYLE, Judge**

STATEMENT OF THE CASE

S.T. ("Mother") appeals the involuntary termination of the parent-child relationship with her son, D.T.[1]

We affirm.

ISSUE

Whether there was clear and convincing evidence to support the termination of Mother's parental rights to D.T.

FACTS

On August 5, 2010, then seventeen-year-old Mother gave birth to D.T. Three weeks later, on August 27, 2010, the Howard County office of the Indiana Department of Child Services ("DCS") received a report from the Kokomo Police Department that Mother had punched D.T. in his stomach and had twisted his right leg. The incident was captured on videotape by Mother's father and step-mother, with whom she lived ("Grandparents"). Grandparents were concerned about D.T.'s safety while in Mother's care and had installed video equipment in their home. D.T. was taken to the hospital, where he was diagnosed with a right tibia fracture, a left femur fracture, and a possible adrenal hemorrhage. Mother was arrested for aggravated battery if committed by an adult and placed in a juvenile detention facility.

---

[1] A father was named as alleged father in the initial CHINS petition and other CHINS documents, but paternity was never established. Thus, there is no father involved in this appeal.

DCS removed D.T. from Mother's care, placed him in therapeutic foster care,[2] and filed a petition alleging that he was a child in need of services ("CHINS"). During the fact-finding hearing, Mother stipulated that D.T. was a CHINS due to her incarceration and continued inability to care for D.T. The trial court determined him to be a CHINS and later appointed a court appointed special advocate ("CASA"). The trial court ordered Mother—once released from incarceration—to cooperate and maintain contact with DCS and parenting service providers; attend therapy sessions; obtain employment and housing; participate in supervised visitation; and refrain from illegal activity. The trial court also ordered Mother to keep DCS updated on the status of her pending criminal charges.

Mother was waived to adult court and was charged with class D felony neglect of a dependent. Mother pled guilty to the charge, and the trial court imposed a three (3) year sentence, all of which was suspended to supervised probation. Mother was then released from incarceration on April 1, 2011.

After her release from jail, Mother did not maintain consistent contact with her DCS family case manager and service providers and failed to fully comply with services. In April 2011, DCS set up parenting and family education services for Mother. These services included helping Mother obtain services in the community, such as Medicaid, food stamps, and birth control; assisting Mother with learning organization and time management skills; and providing some parenting education skills. When Mother attended these service sessions, she had productive sessions, but Mother's attendance was sporadic. At times,

_____

[2] Later, in October 2010, D.T. was placed in relative care.

3

Mother "would be gone for like a week" and have no contact with her family education provider. (Tr. 7).

Also in April 2011, the trial court ordered that Mother could begin supervised visitation after she started participating in therapy and received a recommendation from the therapist that supervised visitation would be appropriate. Mother did not show up for her initial therapy assessment, which was scheduled for May 2011. When Mother ultimately attended her therapy assessment in July 2011, the therapist recommended that Mother participate in group therapy. Mother started group therapy, but she did not fully participate and did not have consistent attendance.

Mother also did not comply with programs that she was supposed to attend as part of her probation for her neglect of a dependent conviction. Mother was supposed to receive services through the Gilead House, but she was ultimately discharged from the Gilead House because of her noncompliance.

Additionally, Mother failed to refrain from illegal activity. Within two months of being released from jail to probation, Mother was charged with conversion. Additionally, Mother, who was required to submit to drug screens as part of her probation for her neglect of a dependent conviction, tested positive for cocaine and opiates within three months of being released from jail.

Thereafter, the trial court, in July 2011, ordered Mother to submit to random drug screens and to participate in an intensive outpatient program ("IOP"). Mother cooperated with the random drug screens and did not have any positive drug screens. Mother attended a

4

few IOP sessions, but she did not fully cooperate and was ultimately released from the program.

Thereafter, DCS arranged for Mother to attend individual therapy. Mother attended an initial assessment with a psychiatrist in the Fall of 2011. The psychiatrist was not able to make an informed diagnosis because Mother was "not being forthcoming with information" and gave "inconsistent answers." (Tr. 24). The psychiatrist recommended neurological testing, which was scheduled but ultimately did not occur because Mother became incarcerated on new charges in January 2012. No psychiatrist or therapist ever recommended that Mother have supervised visitation with D.T.

Mother also failed to maintain stable housing. After Mother was released from jail, Mother was initially housed at a shelter, but she remained there for approximately one week. Thereafter, she fluctuated between staying at her boyfriend's house[3] when he was not incarcerated and staying at her aunt's house.

On December 28, 2011, DCS filed a petition to terminate Mother's parental rights to then sixteen-month-old D.T.

On January 4, 2012, Mother was arrested and charged with false reporting and resisting law enforcement, which apparently resulted in the State filing a motion to revoke Mother's probation from her neglect of a dependent suspended sentence.

The trial court held a termination hearing on February 20, 2012. At the time of the hearing, Mother remained incarcerated but attended the hearing. Following the termination

---

[3] This boyfriend was not the person who was alleged to be D.T.'s father.

hearing, the trial court issued an order terminating Mother's parental rights to D.T. The trial court concluded, in part, that there was a reasonable probability that the conditions that resulted in D.T.'s removal or the reasons for his placement outside the home would not be remedied and entered the following relevant findings and conclusions:

11. The Court finds by clear and convincing evidence that there is a reasonable probability that the conditions that resulted in the removal of the child from the mother's custodial care and the reasons for the child's placement outside of his mother's care and custody will not be remedied for the reasons more specifically stated herein.

*****

24. Since the child's removal, the Mother has made no progress towards her ability to provide for the child. The Mother has been unable to demonstrate a consistent ability to parent and provide for the child with a safe, appropriate home, free from illegal activity, in order to be reunified with the child.

25. The Mother has not been consistently participating in services and failed to attend assessment appointments delaying her necessary therapy so that visitation could be arranged between the Mother and the Child.

26. At three weeks of age, on August 27, 2010, [D.T.] was removed from Mother after she struck and harmed the child, causing him serious bodily injuries. Due to this behavior, Mother was incarcerated on juvenile and criminal cha[r]ges until April 2011. Approximately two months later, on June 24, 2011, Mother was arrested and charged with the offense of conversion. On January 4, 2012, Mother was arrested and charged with false reporting and resisting law enforcement. As of the fact-finding hearing held February 20, 2012, Mother was incarcerated on these pending charges and [had] a petition to revoke her probation.

27. When Mother had been out of jail, she was inconsistent in participating in services and had been difficult to get a hold of at times. Her living arrangements have been unstable. Upon her release from jail in April 2011, Mother moved into the Open Arms shelter. She left after only six days, and thereafter, stayed with a boyfriend or relatives. Mother had to stay with relatives when her boyfriend was periodically arrested and incarcerated.

6

28. After Mother's release from jail in April 2011, the DCS made arrangements for Mother to participate in therapeutic treatment. Mother missed her first appointment, and did not start to attend an IOP at Howard Community Hospital Regional System until July 2011. Thereafter, Mother missed group appointments, was late to group, uncooperative and ultimately dropped from the program as non compliant in late August 2011.

29. Thereafter, DCS arranged for Mother to participate in psychiatric evaluation and treatment recommendations with Psychiatrist Anu Thumuluri. Mother met with Dr. Thumuluri on November and December 19, 2011; however, Dr. Thumuluri was not able to complete her evaluation and treatment recommendation without further neurological testing. The testing was scheduled for February 17, 2012; however, Mother was unable to participate due to her prior arrest and incarceration on criminal charges. At Mother's last appointment with Dr. Thumuluri, the psychiatrist reported the need for further evaluation and a recommendation that any visitation, even supervised, between [D.T.] and Mother not take place.

\* \* \* \* \*

35. In this case, the Mother has shown a pattern of conduct in choosing a criminal lifestyle over her child. The child was removed from the Mother due to the Mother physically abusing the child and causing a possible adrenal hemorrhage, a broken right tibia bone and a broken left femur bone. The Mother was initially charged with Aggravated Battery in Juvenile Court and was subsequently charged with Neglect of a Dependent once she was waived to Adult Court. The Mother pled guilty to the Neglect of a Dependent charge and was given a suspended sentence. Once released from incarceration, Mother was charged with Conversion and most recently charged with False Reporting and Resisting Law Enforcement. A Petition to Revoke Mother's Suspended Sentence was recently filed and is pending.

\* \* \* \* \*

37. The Court finds by clear and convincing evidence that it is reasonably probable that the conditions that led to the removal and that led to placement outside the home, namely the Mother's abuse of her child, her mental health concerns, her commission of illegal acts, and her instability, will not be remedied to the degree that she will be able to provide the child with the nurturing, safe, stable, and appropriate care and environment that he requires on a long term basis.

7

(App. 7, 12-16).[4]  Mother now appeals.[5]  Additional facts will be provided as necessary.

## DECISION

Mother argues that the trial court erred by ordering the involuntary termination of her parent-child relationship with D.T.

"Although parental rights are of a constitutional dimension, the law allows for termination of these rights when parties are unable or unwilling to meet their responsibility as parents."  *In re A.N.J.*, 690 N.E.2d 716, 720 (Ind. Ct. App. 1997); *see also In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010).  The purpose of termination of parental rights is not to punish parents but to protect children.  *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied*.

In reviewing the termination of parental rights, we will neither reweigh the evidence nor judge the credibility of witnesses.  *I.A.*, 934 N.E.2d at 1132.  We consider only the evidence most favorable to the judgment.  *Id.*  Where the trial court has entered findings of fact and conclusions of law, we apply a two-tiered standard of review.  *Id.*  We must determine whether the evidence supports the findings and then whether the findings support

---

[4] The record on appeal does not include documents that were mentioned during the termination hearing.  For example, the DCS family case manager, Jennifer Boston, testified that she had attached a letter from Mother's therapist regarding the recommendation that visitation not occur.  Boston's report and the letter were not included in the record on appeal.  However, it is clear that it was considered by the trial court because the trial court referenced the recommendation from Dr. Thumuluri in its termination order.  Additionally, the CASA, Keith Land, testified that he filed a CASA report on February 3, 2012, but the record before us contains only the CASA reports that were filed in July 2011 and September 2011.

[5] Prior to briefing in this case, DCS filed a Motion to Dismiss the Appeal for Failure to Perfect Appeal.  The Motions Panel of this Court reviewed and denied DCS's motion.

the judgment. *Id.* We will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the conclusions or the conclusions do not support the judgment. *Id.*

When DCS seeks to terminate parental rights, it must plead and prove, in relevant part:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services . . . .

Ind. Code § 31–35–2–4(b)(2).[6] These allegations must be established by clear and convincing evidence. *I.A.*, 934 N.E.2d at 1133. If the trial court finds the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. I.C. § 31–35–2–8(a) (emphasis added).

Mother argues that the DCS failed to prove that there was a reasonable probability that the conditions that resulted in D.T.'s removal or the reasons for placement outside the home will not be remedied.[7] Specifically, Mother contends that termination was not appropriate

---

[6] Indiana Code § 31–35–2–4 was amended by Public Law No. 48–2012 (effective July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

[7] Mother also argues that the trial court erred by finding that the continuation of the parent-child relationship would pose a threat to the well-being of D.T. Indiana Code § 31-35-2-4(b)(2)(B), which is written in the disjunctive, required DCS to demonstrate by clear and convincing evidence a reasonable probability that *either*: (1) the conditions that resulted in the child's removal or the reasons for placement outside the home of

9

because she was never able to have visitation with D.T. after his removal from her care.

To determine whether a reasonable probability exists that the conditions justifying a child's continued placement outside the home will not be remedied, the trial court must judge a parent's fitness to care for the child at the time of the termination hearing, taking into consideration any evidence of changed conditions. *A.N.J.*, 690 N.E.2d at 721. The trial court must also evaluate the parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* A trial court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe County Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Additionally, the trial court can properly consider the services offered by DCS to the parent and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* "A pattern of unwillingness to deal with parenting problems and to cooperate

the parents will not be remedied, *or* (2) the continuation of the parent-child relationship poses a threat to the well-being of the child. Because we conclude that clear and convincing evidence supports the trial court's conclusion that a reasonable probability exists that the conditions that led to D.T.'s removal and reasons for placement outside the home will not be remedied, we need not review whether the evidence supports the trial court's conclusion that a reasonable probability exists that the continuation of the parent-child relationship poses a threat to D.T.'s well-being. *See Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 148 n.5 (Ind. 2005).

with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *L.S.*, 717 N.E.2d at 210.

Here, then three-week-old D.T. was removed from Mother's home after Mother broke the infant's leg and punched him in the stomach. Mother was incarcerated and later pled guilty to class D felony neglect of a dependent. Mother remained incarcerated during the first eight months of D.T.'s life. After Mother was released from jail to probation, the trial court ordered that Mother could begin supervised visitation with D.T. after she started participating in therapy and received a recommendation from the therapist that supervised visitation would be appropriate. Mother, however, did not fully complete her various therapy assignments, which included group therapy, an IOP, and individual therapy. As a result, Mother was not able to get a recommendation for visitation. Mother also had sporadic participation in and failed to fully comply with parenting and family education services. Additionally, Mother engaged in additional illegal activity. Indeed, at the time of the termination hearing, Mother was incarcerated on pending charges and had a pending petition to revoke her probation on her three-year suspended sentence from her neglect of a dependent conviction.

We acknowledge that Mother did not have visitation prior to the termination proceeding, but we cannot overlook her pattern of conduct and failure to do what was necessary to be reunified with D.T. Accordingly, we find that the trial court did not err in determining that there is a reasonable probability that the conditions that resulted in D.T.'s

11

removal or the reasons for placement outside the home will not be remedied.

We conclude there was clear and convincing evidence to support the trial court's decision to terminate Mother's parental rights to D.T. We reverse a termination of parental rights "only upon a showing of 'clear error' — that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and, therefore, affirm the trial court.

Affirmed.

FRIEDLANDER, J., and BROWN, J., concur.