## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 28 2017, 8:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Amy Karozos
Greenwood, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of C.D. & J.D. (Children) and N.D. (Mother);

N.D. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

April 28, 2017

Court of Appeals Case No.
49A02-1611-JT-2466

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge
The Honorable Larry Bradley, Magistrate

Trial Court Cause No.
49D09-1605-JT-480
49D09-1605-JT-481

**May, Judge.**

N.D. ("Mother") appeals the termination of her parental rights to C.D. and J.D. (collectively, "Children"). She argues the evidence was insufficient to support termination. We affirm.

## Facts and Procedural History

C.D. was born to Mother and E.B.[1] on January 21, 2014. Mother is diagnosed with schizophrenia and Post-Traumatic Stress Disorder ("PTSD"). In August 2014, Mother took C.D. to Riley Children's Hospital because C.D. had a mark under his eye.[2] The Department of Child Services ("DCS") received a report on August 17, 2014, concerning Mother's ability to care for C.D., alleging Mother was homeless and was not taking medication for her mental health diagnoses.

On August 18, 2014, Family Case Manager ("FCM") Peter McCoskey completed an initial assessment of Mother and C.D. McCoskey spoke with Mother, a social worker at Riley Hospital, and a case manager from the shelter at which Mother had been staying. McCoskey learned Mother lost her bed at the shelter when she took C.D. to the hospital and "had no place to go," (Tr. at 40), because she did not make it back to the shelter before the cut-off time.

---

[1] The alleged father of C.D. is E.B., who is believed to be deceased.

[2] The record does not indicate how the "mark" under C.D.'s eye originated. (Tr. at 41.)

Mother also informed McCoskey she had stopped attending her mental health treatment sessions at the beginning of August.

[4] That same day, DCS removed C.D. from Mother's care on an emergency basis and placed C.D. in foster care. Later that day, the juvenile court held an initial hearing on C.D.'s removal. The court found C.D. was "seriously endangered," (Ex. 2), and it was in C.D.'s best interests to be removed from Mother's care. The court granted DCS temporary wardship of C.D. and granted DCS permission to file a petition alleging C.D. was a Child in Need of Services ("CHINS"). The court appointed a Guardian Ad Litem ("GAL") for C.D. DCS filed its petition alleging C.D. was a CHINS under Cause Number 49D09-1408-JC-1764 ("Cause No. 1764").

[5] On October 21, 2014, the court held a fact-finding hearing on DCS's CHINS petition. Mother's counsel, DCS's counsel, C.D.'s GAL, C.D.'s maternal grandmother ("Grandmother"),[3] and Grandmother's counsel appeared. Grandmother requested C.D. be placed in her care. Mother failed to appear, but Mother's attorney stated Mother objected to C.D.'s placement with Grandmother, and counsel requested a continuance. The court granted the continuance and ordered DCS to investigate placing C.D. with Grandmother.

---

[3]We note the record refers to "grandparents" and "grandmother" interchangeably. Based on context in the record, we infer the trial court's reference to "grandparents" is to Grandmother and her boyfriend. For clarity, we refer only to "Grandmother" in this opinion.

[6] On October 28, 2014, the court held the continued fact-finding hearing and adjudicated C.D. a CHINS. Mother appeared and objected to C.D.'s placement with Grandmother, alleging "she ha[d] safety issues" with Grandmother. (Ex. 9.) The court ordered C.D. remain in his foster care placement and not be placed with Grandmother. The court also entered a parental participation order requiring Mother to engage in a homebased counseling program, all family members actively participate in the homebased counseling, and Mother meet all personal medical and mental health needs in a timely and complete manner. Specifically, the court ordered Mother to follow all directions of her nurses and doctors, attend all appointments, and properly take all medications prescribed to her. The court authorized Mother to have more parenting time pending recommendations from service providers.

[7] In November 2014, Mother obtained an apartment of her own with support from Midtown Community Mental Health Center. On December 19, 2014, Mother filed a motion requesting C.D. be placed in Grandmother's care. The court set a hearing on Mother's motion for January 20, 2015. At the January 20 hearing, Mother withdrew her request and indicated she no longer wished to have C.D. placed with Grandmother. The court ordered C.D.'s placement in foster care continue.

[8] On February 17, 2015, the court held a periodic review hearing. Mother and her attorney requested DCS refer a new homebased provider because Mother was having conflicts with her current homebased provider. The court ordered DCS to make a new referral for Mother's homebased provider and to continue

supervised parenting time. The court further ordered DCS to make referrals for services for Mother's boyfriend, J.M. ("Boyfriend"), if he was willing to participate.

[9] On May 19, 2015, Mother filed a motion to have C.D. placed with Grandmother. On May 26, 2015, the court held a periodic review hearing. At the hearing, Mother reaffirmed her request for C.D. to be placed with Grandmother. The court ordered for C.D.'s continued placement in his current foster care, but authorized C.D.'s "transition into [Grandmother's] home pending positive recommendations" by service providers. (Ex. 14.)

[10] On July 31, 2015, Mother gave birth to J.D.[4] When J.D. was born, Mother had not completed any services required by the court for C.D. to return to her care under Cause No. 1764. Mother also was not successfully engaging in visitation services. Thus, on August 5, 2015, DCS removed J.D. from Mother's care and placed him in foster care, citing Mother's inability, refusal, and neglect. That same day, the court held a hearing on J.D.'s removal. The court granted DCS permission to file a CHINS petition, granted DCS temporary wardship of J.D., and appointed a GAL for J.D. DCS filed its petition alleging J.D. was a CHINS under Cause Number 49D01-1508-JC-2371 ("Cause No. 2371").

---

[4] Boyfriend is the alleged father of J.D., but the record does not indicate his paternity was ever established. As he was never made a party to these proceedings involving J.D., Boyfriend is not part of this appeal.

[11] On August 11, 2015, the court held a permanency hearing for C.D. under Cause No. 1764. The court noted Mother had not seen C.D. since December 2014 and Mother previously had indicated "she did not want [C.D.]" (Ex. 20.) DCS nevertheless recommended the plan for C.D. remain reunification, "not because of any progress that Mother ha[d] made," but so J.D. and C.D. would "be on a similar 'track.'" (*Id.*) The court noted "Mother [had] shown some renewed motivation" since J.D. was born, (*id.*), and ordered the permanency plan remain reunification.

[12] On September 28, 2015, Mother filed a motion to have J.D. placed with Grandmother. On September 29, 2015, the court held a dispositional hearing for J.D. The court adjudicated J.D. a CHINS and ordered for him to remain in his current foster care placement. The court denied Mother's request to have J.D. placed with Grandmother because of allegations Mother had made to DCS about Grandmother sexually abusing C.D.,[5] but it authorized Grandmother to have supervised visitation with J.D. The court also entered a parental participation decree ordering Mother and Boyfriend to engage in homebased therapy, homebased case management, and domestic violence services. The court further ordered Mother to complete a psychological evaluation.

---

[5]Mother made numerous allegations of abuse against Grandmother throughout this CHINS case. None of the allegations were substantiated. At the termination hearing, Mother testified her allegations were not true and she made up allegations about Grandmother "to get back at [Grandmother]" because she thought Grandmother "was against [her]." (Tr. at 20.)

[13]     On November 4, 2015, DCS filed a motion to suspend all visitation between Grandmother and Children based on Mother's continued allegations of abuse by Grandmother. On November 12, 2015, the court suspended visitation between Children and Grandmother.

[14]     On December 1, 2015, the court held a periodic review hearing for both Children. Children were in foster care. Mother's counsel indicated Mother was attending domestic violence classes and counseling. Mother again noted her "concerns with [Children] being placed with [Grandmother]," citing a "previous molest." (Ex. 27.) The court continued Children in their foster care placement and continued the suspension of visitation between Children and Grandmother. The permanency plan remained reunification.

[15]     On March 15, 2016, the court held a review hearing. Mother's counsel reported Mother "felt she was [not] getting anywhere" with her homebased service providers, and counsel requested Mother be provided a new case manager. (Ex. 28.) Mother requested "[J.D.] be placed with her and [C.D.] be placed with [Grandmother]," but that if J.D. could not be placed with Mother, Mother requested J.D. also be placed with Grandmother. (*Id.*) The court denied Mother's requests and ordered Children remain in foster care. The court ordered parties to meet and discuss permanency issues, and it scheduled a permanency hearing for April 19, 2016.

[16]     Mother appeared for that permanency hearing, but Boyfriend failed to appear. The court made the following findings:

1) This matter has been open since August of 2014 for [C.D.] and August of 2015 for [J.D.] and no service provider has recommended that these children be placed into the care of Mother or [Boyfriend].

2) Mother has not completed her homebased case management and has not been adequately addressing her mental health needs.

3) Mother last visited with the children on January 8, 2016 despite being offered multiple options.

4) [Boyfriend] is not participating in any services and his current whereabouts are unknown.

5) Neither parent has fully enhanced their ability to parent and while some progress has been made to achieve a successful reunification, it is not sufficient enough to merit keeping the plan reunification.

6) The children are in foster care and that care provider is willing to adopt.

7) The best interests of these children require a change in plan to adoption.

(Ex. 29.) The court further found DCS made "extensive efforts" to provide Mother and Boyfriend with services to assist them in addressing their issues, (*id.*), but Mother and Boyfriend failed to meaningfully engage with any service provider or address their issues "in any manner" to act in Children's best interests. (*Id.*) The court changed the permanency plan for Children to

adoption.  The court scheduled a permanency review hearing for August 9, 2016.

[17] In May 2016, Mother moved in with Grandmother, and she continued living there for the remainder of the case.  On May 12, 2016, DCS filed its petition to terminate Mother's parental rights.  On September 28, 2016, the trial court held a termination hearing.  The court heard thorough testimony from Mother, Grandmother, FCM McCoskey, FCM Elizabeth Benitez, FCM Jennifer Hart, FCM Jen Blevins, FCM Joycelynn Harrell, and Children's GAL.  On October 5, 2016, the trial court terminated Mother's parental rights to Children.

# Discussion and Decision

[18] "The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009), *reh'g denied*.  To terminate a parent's rights, the State must file a petition in accordance with Indiana Code Section 31-35-2-4 and then prove the allegations therein by clear and convincing evidence.  *Id.* at 1260-61.  If the court finds the allegations in the petition are true, it must terminate the parent-child relationship.  Ind. Code § 31-35-2-8; *In re N.G.,* 51 N.E.3d 1167, 1170 (Ind. 2016).

[19] A petition to terminate the parent-child relationship must allege:

>    (A) that one (1) of the following is true:

(i)     The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii)    A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii)    The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The trial court must enter findings of fact to support each of its conclusions as to those allegations. Ind. Code § 31-35-2-8(c).

[20] We review termination of parental rights with great deference. *In re K.S., D.S., & B.G.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh

evidence or judge credibility of witnesses. *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* We apply a two-tiered standard of review: we determine first whether the evidence clearly and convincingly supports the findings, and second whether the findings clearly and convincingly support the conclusions. *In re E.M.,* 4 N.E.3d 636, 642 (Ind. 2014). However, where a party challenges the judgment but does not challenge the findings of fact as unsupported by the evidence, we look only to the findings to determine whether they support the judgment. *Smith v. Miller Builders, Inc.,* 741 N.E.2d 731, 734 (Ind. Ct. App. 2000). We will set aside a judgment terminating a parent's rights only if it is clearly erroneous. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

[21] Mother challenges the court's conclusion under subsection (B) that there was a reasonable probability the continuation of the parent-child relationship poses a threat to the well-being of the child.[6] In concluding continuation of the parent-

---

[6]In her Reply Brief, Mother argues she "[does] not concede the sufficiency of any of the other required elements" in her Appellant's Brief, but merely "raised her strongest arguments[.]" (Appellant's Reply Br. at 5.) However, Mother fails to make any specific arguments challenging the trial court's conclusions the Children had been removed from Mother's care for the requisite time period under subsection (A), termination is in the best interests of Children under subsection (C), or there was a satisfactory plan for care and treatment of the Children under subsection (D). Therefore, to the extent Mother challenges the sufficiency of the trial court's conclusions under subsections (A), (C), or (D), we hold she waived these arguments on appeal because she failed to support them with a cogent argument. *See In re A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 n.4 (Ind. Ct. App. 2013) (finding elements of Ind. Code § 31-35-2-4(b)(2) waived where appellant failed to make cogent argument), *trans. denied.*

child relationship posed a threat to Children's well-being, the trial court stated "the children's safety would be questionable if placed with their mother due to lack of interest, lack of parenting skills, and failure to adequately address domestic violence issues." (App. Vol. II at 26.) In support of this conclusion, the court made the following findings:

14. The parenting time referral could be up to ten hours per week. When she does participate in visits, [Mother] has limited the time to two hours or less.

15. Although she has repeatedly been offered more parenting time and chances to make up missed visits, [Mother] has responded that more than two hours is too much and the IDCS should be able to tell in two hours whether she can parent.

16. [Mother] has only attended twelve visits with her children during the 2016 calendar year. She has told her parenting time supervisor that she has other things to do and has important appointments. She has missed visits, or left early, to watch a television show.

17. [Mother] was not open to suggestions or direction during parenting time.

* * * * *

19. [Mother] suffers from a diagnosis of [PTSD] and Paranoid Schizophrenia. She appears to be taking her medications but has admitted to the family case manager and at a team meeting of going off and on them during the CHINS case. She is to receive therapy and medication through Midtown Mental Health but

[Mother] has retracted her consent to release of information to verify compliance. She refused another type of therapy referral.

20. [Mother] admitted on multiple occasions that there was domestic violence in her home and parenting time was moved from in-home to an agency due to safety concerns.

21. A domestic violence referral was made three times. [Mother] commenced a twenty-six week program twice but did not complete one.

\* \* \* \* \*

23. At the time of trial in this matter, [Mother] was residing with her mother and her mother's boyfriend in a two-bedroom home. She had an apartment on her own from November of 2014 to May of 2016.

24. [Grandmother] would be some support but there are concerns regarding the unstable relationship between [Mother] and [Grandmother]. Throughout the CHINS case [Mother] has gone back and forth on having the children placed with her mother and the granting of Grandmother visitation.

(*Id.*)

These findings are supported by the evidence. Benitez, who was Mother's visit supervisor from August 2014 through October 2014, testified she and Mother "didn't make any progress" in their time together. (Tr. at 44.) As a result of Mother's frequent cancellations and no-shows, Benitez was forced to close her case with Mother in October 2014.

[23] FCM Harrell, who was assigned to this case in September 2015, also testified regarding Mother's failure to make progress in parental visits. Harrell testified Mother was allowed eight to ten hours of parenting time a week and could "split that eight to ten hours up however she want[ed]." (*Id.* at 62.) However, Harrell testified Mother "visit[ed] once a week when she [did] not cancel," (*id.*), and then only for "about two hours." (*Id.*) Harrell indicated Mother gave various excuses for canceling, including on a couple of occasions, wanting to watch her "favorite show" instead of visiting. (*Id.*)

[24] Harrell also indicated Mother became upset at parenting visits when Harrell gave Mother suggestions on parenting, and Mother would often "end the visit." (*Id.* at 62-63.) Mother had even preemptively canceled parenting visits on the basis "she didn't want to get into an argument with [Harrell]." (*Id.* at 63.) Other reasons Mother had given for cancelling include needing to take care of Grandmother because she is "older," (*id.*), being "tired from taking her medication," (*id.*), and having other "important appointments." (*Id.*) Harrell further testified Mother was "distracted at times during the visits" in contrast to Children, who were very active. (*Id.* at 67.) In total, Harrell testified Mother attended only twelve visits with Children in 2016. Harrell opined she would "want to see that [Mother] is able to have longer visit times with [Children] and be able to manage [Children] the entire visit without [Harrell] having to intervene" before Children could return to Mother's care. (*Id.* at 77.)

[25] The court's finding of safety concerns are further supported by FCM Blevins' testimony. Blevins, like Harrell, testified Mother "was having problems making

it to the assigned visitation times at the same time every week and seemed to always have an urgent issue pop up in the two hours per week or less that she visited." (*Id.* at 81.) Mother admitted to Blevins she was "off and on her medication" for her PTSD and schizophrenia, (*id.* at 82), and Mother admitted to Blevins that domestic violence occurred with Boyfriend. Blevins stated on one occasion, she heard what sounded like domestic violence occurring on a voicemail Mother left Blevins. Blevins described the voicemail containing "screaming and saying no," (*id.*), "banging," (*id.*), and "some kind of physical altercation." (*Id.*) The trial court noted that, while Mother was referred to domestic violence programs, she never completed any.

[26] Blevins testified "[Mother] has never progressed enough with her supervised parenting time to go to unsupervised parenting time. She's actually probably regressed a little bit." (*Id.* at 83.) Blevins indicated Mother regressed because "she's gone backwards in the amount of time that she spends with the children and with her interaction with the children." (*Id.*) Blevins further indicated she, the Children's GAL, and Harrell met with Mother at one point "to talk her into [participating in] more parenting time[,]" but Mother "maintained that [they] should be able to tell if she was a good parent within that two hours" she was already attending, and "anything more than two hours [was] too much for her." (*Id.*) Blevins described Mother as being "erratic and more emotional" when she was off her medication. (*Id.* at 84.) Ultimately, Blevins asked the court to terminate the parent-child relationship between Mother and Children because she "[did not] feel that [Mother] can parent the children." (*Id.* at 85.)

[27] As the trial court found, the evidence indicates returning to Mother's care would pose grave concerns for Children's safety and well-being. Indeed, if Children were placed back into Mother's care, they would be living in Grandmother's home with Mother, Grandmother, and Grandmother's boyfriend. Blevins specifically indicated she was concerned Mother "would continue to engage in domestic violence, would continue to have instability with her mental health, and continue to have instability with her relationship with [Grandmother]." (*Id.*) Blevins testified she did not believe it was safe for Children to be living with Mother in Grandmother's home given the allegations Mother had made on several occasions regarding Grandmother molesting her and C.D. Blevins noted how Mother had been inconsistent with her allegations against Grandmother, changing her story "every couple of months for the duration of the case." (*Id.* at 86.) Blevins noted Mother's allegation that Grandmother molested Mother and C.D., followed by Mother's statement she "forgave her mother for doing that and then she wanted [Children] placed with [Grandmother]," then Mother's statement that "nothing happened and she lied" about the whole thing. (*Id.*)

[28] We note that, at the termination hearing, Mother testified her allegations against Grandmother were not true and she made up the allegations "to get back at" Grandmother because she thought Grandmother "was against her." (*Id.* at 20.) The record does not reflect the trial court's conclusion as to the veracity of Mother's allegations, and we will not endeavor to judge Mother's credibility. *See In re D.J. v. Indiana Dep't of Child Servs.,* 68 N.E.3d 574, 577-78

(Ind. 2017) (appellate court does not reweigh evidence or judge witness credibility). However, as the trial court found, one thing is patently clear from the record: Mother has a seriously unstable relationship with Grandmother. In addition to her inconsistent allegations of abuse against Grandmother, Mother repeatedly filed and withdrew motions to have Children placed with Grandmother throughout the case. In light of the clear pattern of instability, the trial court was warranted in concluding returning to Mother's care would pose serious safety concerns for Children.

[29] Mother's argument the trial court's conclusion "is not supported by the evidence or findings," (Appellant's Br. at 20), is without merit. Mother asserts "DCS did not present evidence that showed a lack of parenting skills," (*id.*), pointing to testimony from DCS family case managers that she "demonstrate[d] basic parenting knowledge," (Tr. at 44), "appropriately discipline[d] or redirect[ed] [Children] when necessary," (*id.* at 56), and was "nurturing." (*Id.* at 69.)

[30] However, where Mother cites DCS's testimony discussing Mother's positive attributes, she omits accompanying DCS testimony regarding her failure to make progress. For example, Benitez's testimony, when read as a whole, states Mother "was able to demonstrate basic knowledge, um and uh [sic] she did some bonding activities. But visits were infrequent due to a lot of cancellations and no shows." (*Id.* at 44.) Additionally, while Hart testified she observed Mother "appropriately discipline and redirect" Children, Hart also discussed having to move parenting visitations from Mother's home to the DCS offices

for Children's safety because Mother reported verbal altercations with Boyfriend. Lastly, Harrell acknowledged "when [Mother] is there with [Children], she is nurturing with them," but noted if she suggested anything to Mother, Mother would "become very upset" and end visits early. (*Id.* at 69-70.) In light of all these facts, the evidence supports the trial court's findings, and those findings support the conclusion that Children's safety would be at risk in Mother's care and, thus, continuation of the parent-child relationship posed a threat to Children's well-being.[7] *See In re K.S.,* 750 N.E.2d 832, 838 (Ind. Ct. App. 2001) (holding evidence and findings clearly supported conclusion continuation of parent-child relationship posed a threat to children's well-being).

# Conclusion

[31] Mother's lack of parenting skills, lack of interest in improving those skills, and failure to address domestic violence issues are clearly supported by the record. The court did not err in concluding there was a reasonable probability continuation of the parent-child relationship posed a threat to Children under

---

[7]Because our legislature wrote subsection (B) in the disjunctive, a trial court needs to find only one of the three requirements established by clear and convincing evidence before terminating parental rights. *In re L.S.*, 717 N.E.2d 204, 209 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002). Nevertheless, we note the trial court found there was a reasonable probability both under subsection (B)(i) the conditions that resulted in Children's removal or continued placement outside the home would not be remedied by Mother *and* under subsection (B)(ii) there was a reasonably probability the continuation of the parent-child relationship poses a threat to the well-being of Children. Mother challenges both conclusions. Because there is sufficient evidence continuation of the parent-child relationship poses a threat to the well-being of Children under (B)(ii), we need not address the court's conclusion under (B)(i).

Indiana Code Section 31-35-2-4(b)(2)(B)(ii). Accordingly, we affirm its decision to terminate Mother's parental rights.

[32] Affirmed.

Najam, J., and Bailey, J., concur.